**BRANDTJEN & KLUGE, INC., Plaintiff/Counter–Defendant,**

v.

**Dale PRUDHOMME d/b/a Joe Prudhomme Co., Defendant/ Counter–Plaintiff.**

**Civ. A. No. CA3–88–0986–D.**

N.D. Texas, Dallas Division.

June 10, 1991.

Raymond E. LaDriere, II and Kendra Karlock of Locke Purnell Rain Harrell, Dallas, Tex., for plaintiff/counter-defendant.

John W. Montgomery and Patrick J. Glynn of Sigalos, Levine & Montgomery,

Dallas, Tex., for defendant/counter-plaintiff.

FITZWATER, District Judge:

This action for trademark infringement and unfair competition involves a manufacturer's request to control the rebuilding and resale of its trademarked presses. The defendant has filed a counterclaim for tortious interference with actual and prospective contracts. Following a bench trial, the court dismisses with prejudice both parties' claims for the reasons assigned.[1]

I

Plaintiff Brandtjen & Kluge, Inc. ("BKI") sues defendant Dale Prudhomme d/b/a Joe Prudhomme Company ("Prudhomme") for trademark infringement and unfair trade practices. Prudhomme counterclaims for tortious interference with actual and prospective contracts.[2]

BKI is the owner of the trademark KLUGE for certain platen [3] printing presses, automatic sheet feeding and delivering mechanisms for platen printing presses, and automatically fed platen printing presses. PX 1. The KLUGE trademark was first used in commerce in or about 1919, was registered by the United States Patent and Trademark Office ("PTO") in 1964, and registration was renewed in 1984. *Id.* The KLUGE trademark was separately registered by the PTO in 1985 for "printing presses; business forms imprinting presses; die cutting, embossing, foil stamping, automatic sheet feeding, delivering, fan folding, unwinding, rewinding, hole punching, and paper processing mechanisms—all for use with or in connection with certain printing presses." *Id.*

BKI began as a company in 1919 by developing the first automatic feeder for platen presses. It later began manufactur-

ing platen presses under the trademark KLUGE. From 1932 to 1948 the KLUGE press was the most successful automatic platen press theretofore produced. The introduction into the U.S. market in 1948 of a German-made press hurt BKI's business, as did the subsequent success of so-called instant printing shops. But BKI has survived as a company by producing a first-rate product and the trademark KLUGE is associated with quality in the press manufacturing industry.

In the 1920s and 1930s platen presses performed the work of job presses. These machines were typically used to print envelopes, letterheads, business cards, and the like. Much of this work is now done by instant printing shops. In the 1930s BKI began manufacturing a heavier press capable of performing die cutting. A press operator performed this process by mounting a steel rule die in place of type. The die was then used to cut material (such as cardboard shirt boards) on the press platen. The same process could be followed using a perforating blade. Through the beginning of the 1960s KLUGE presses were manufactured for printing and die cutting on paper products.

BKI produced prior to 1960 an M series press (measuring 10″ × 15″ and designated models A, B, and C) and an N series press (measuring 12″ × 18″ and designated models A, B, and C). There were hand-fed and automatic versions in both sizes, as well as printing press, die cutting, and combination printing and die cutting models.

The BKI presses that performed die cutting were heavier and stronger. They were driven by two flywheels instead of one and were made with high strength steel shafts. These presses had heavier beds and platens and were 25% stronger than the printing press model. Pre–1960

---

1. The court sets forth its findings of fact and conclusions of law in this opinion. *See* Fed.R. Civ.P. 52(a).

2. Prudhomme also counterclaimed for attempted monopolization and trademark cancellation. The court dismissed these theories on summary judgment motion. *See Brandtjen & Kluge, Inc. v. Prudhomme,* 1989–2 Trade Cases (CCH)

¶ 68,820 [1989 WL 121197] (N.D.Tex. Oct. 10, 1989).

3. A "platen" printing press is one in which one of the two flat members of the printing unit—the platen—serves to position the feedstock and hold it against the other member—the press bed.

KLUGE presses were painted a gray color that was so dark the presses were known in the printing industry as the "black" press.

In 1960 BKI introduced a new series of presses—the D series—incorporating a variety of changes in the basic KLUGE press. Among other things, BKI replaced the spoked flywheel with a solid one; substituted for the open cast iron frame an enclosed, stronger and solid steel frame; eliminated the press' throw-off handle and replaced it with a cable; enclosed the cam base, open gears, compressed springs, and certain other components; built in the pulley guard and placed mesh over the exposed area of the flywheel; and covered the flywheel. The new D series presses also had a constant speed motor as opposed to the pre–1960 voltage controlled motor. The new style motor increased press speed by 500 impressions per hour. BKI also made two other changes of significance. It altered the size of its pre–1960 models, replacing the $12'' \times 18''$ N series presses with a $13'' \times 19''$ version and the $10'' \times 15''$ M series presses with machines measuring $11'' \times 17''$. BKI also changed the dark gray color of its "black" presses to a green color known as "KLUGE green."

In approximately 1962 the printing industry saw incipient interest in the utilization of presses for foil stamping and embossing. By 1967 or 1968 there was a ready demand for these processes. Foil stamping and embossing both required presses that could apply greater pressure to paper stock. And in each process it was necessary that stock be heated in order to take permanent shape. Heat was a requisite element of foil stamping to set the adhesive that enabled foil and underlying layers to adhere to paper. To meet printing industry demand for machines capable of performing these processes, press manufacturers like BKI were required to produce heavier presses that could exert greater pressure.

The printing industry in the 1970s and 1980s also witnessed demand for different feed stocks. In addition to printing on paper, customers requested, among other things, printing on adhesive-backed pressure sensitive labels and foil stamping and die cutting on transparent plastic material. To keep up with demand, printing dies inevitably progressed from the rather simple to the very complex.

BKI responded to printing industry needs by changing its D series presses and introducing new model machines. In approximately 1962 BKI introduced the model HD press; in 1967–68 the model EHD press; and in 1983–84 the EHE press. Each machine was introduced in response to demand in the printing trade for a heavier and stronger press that would not break or stall when performing functions related to different dies, foil stamping, embossing, and the use of non-paper stock. One or more of these models reflected stronger and larger shafts, wrist pins, side arms, and platens. There was demand in the printing industry, for example, for larger foil stamping areas. So the model EHE was designed and manufactured to be 20% stronger than the model EHD.

In BKI's view, its pre–1960 presses (series M and N) cannot be used for heavier foil stamping and embossing. This is so because the presses are not designed for these functions and the heavier pressure required causes press shafts to break, wrist pins to pull, and the press to freeze up or otherwise not to perform.

KLUGE presses built prior to 1960 were manufactured to meet quality and durability standards that have enabled them to remain in use in print shops even today. But concerns for worker safety were not as acute then as they are now. BKI presses manufactured prior to 1960 were made without installing guarding devices or giving safety warnings to press operators. The use of KLUGE presses for foil stamping and embossing processes, and the use of non-paper stock for which BKI presses were not designed, has proliferated worker safety concerns at BKI. One press malfunction can occur when feedstock jams at the press' point of operation, that is, where platen and bed close together.[4] Press oper-

---

**4.** In the KLUGE N series press, for example, paper stock is loaded into the magazine, the

ators—either because they are poorly trained or act instinctively or to protect valuable feedstock—place their hands in or near the point of operation and suffer personal injury. The lack of guarding on certain KLUGE presses, and the absence of warnings, permit this to happen.

The typical press operator has changed over the years. In the 1940s and before, the printing trade was taught in high school. Presses were different and students were highly restricted in how they could work around a press until they gained experience. Once printing students entered the graphic arts trade, they began an apprenticeship of sometimes up to six years' duration. For a prolonged period of time during their apprenticeships they were forbidden from operating presses.

Beginning in the 1960s the apprenticeship period became more compressed, first to four years, then to two to three years in the 1970s, until now there is no real apprenticeship in the trade. Press operators are often hired off the street, given minimal training (including scant safety instruction), and instructed to operate a press.

In BKI's experience, there are very few worker accidents among true printing tradesmen or on presses used to print on paper stock. Injuries proliferate among unskilled workers or workers who attempt to perform foil stamping and die cutting on specialized stocks, or upon presses not designed for these functions.

BKI no longer sells new or rebuilt hand-fed presses. On its pre–1960 automatic presses the point of operation is blocked at the front by the livery and magazine. But a worker can still place a hand in the point of operation by standing to the side of the press. BKI stopped selling rebuilt pre–1960 presses in 1978 and in 1978–79 ceased the sale of parts for use in rebuilding these models. Beginning in 1979 if a purchaser desired to buy parts for an older style press, BKI required the purchaser to prove the press was a model D series—a post–

1960 press—before selling the parts. In the 1980s if a customer traded an older model press to BKI toward purchase of a new one, BKI junked the traded press.

In the 1980s BKI's sensitivity to worker safety concerns became acute. BKI's motivation to produce a safe press did not hinge only on a desire to maintain its reputation for quality, or by reasons grounded in moral considerations or business ethics. By this time product liability awards and settlements were driving up the cost of insurance.

In approximately 1984 BKI's product liability insurance carrier notified BKI that, due to the number of older KLUGE machines still in use, the carrier would decline to renew BKI's policy. BKI almost decided to drop its insurance coverage but determined not to do so. It was able to obtain one extension of coverage, but the premium for $1 million in policy limits rose from approximately $60,000 for 1984–85 to $125,-000 for 1985–86.

During this time BKI told parts purchasers that older KLUGE models were not safe. BKI began generating files on the identities of KLUGE press owners and, by serial number, of the press owned. Parts purchasers were required to provide BKI with the serial numbers of their presses before they were permitted to buy parts.

In 1986 BKI faced a second liability insurance crisis. Its insurance carrier conditioned continued coverage on a drastically increased premium because of the accident rate, BKI's present product line, and the number of old machines still in use. Compared to the 1985–86 premium of $125,000 for $1 million in coverage, BKI was required to pay $660,000 with a deductible of approximately $25,000. This sum was significant for a company of BKI's size and market position. The insurance cost represented over a ten-fold premium increase in just two years. BKI again considered operating without liability insurance of this type, but declined to do so because one

automatic feeder dips into the magazine, picks up the lead sheet, and feeds it to the platen. The press' side arm pulls the platen and bed into

position. The two surfaces—bed and platen—then close in order to make the impression on the paper.

successful claim could potentially wipe out the company.

In order to deal with escalating insurance rates, BKI undertook an aggressive program[5] of ferreting out the identity of owners of older KLUGE presses, increasing safety design efforts on newly produced presses (so that safety is an integral consideration in machine design), and designing, manufacturing, and selling retrofit guard kits for KLUGE presses built between 1960 and 1986. BKI also began monitoring more closely product liability claims involving KLUGE presses.

Due to the design of pre–1960 presses, BKI determined the presses could not be made safe and warned known press owners to discontinue using them. BKI believed it was obligated legally to warn product users of the hazards of its presses, of the availability of guard kits, and of the impossibility of adequately guarding pre–1960 models. BKI sent letters (DX 30) to known owners and users of pre–1960 presses, advising them the presses did not meet standards adopted by the Occupational Safety and Health Administration ("OSHA") and the American National Standards Institute, Inc. ("ANSI"). BKI warned the press owners the machines could not be brought up to such standards and should be taken out of production. The communique was a form letter sent to persons who had purchased parts for pre–1960 presses.

BKI also began selling its guard kits for 1960–86 presses. The kits differed slightly depending on press model and date of manufacture. Each kit essentially included enclosures of both flywheels; an air brake system; and interlock gate system that, when opened, stopped the press by actuating the air brake; new electronics to control the air brake and to bring the press into compliance with ANSI standards; and a lock-out-take-out. All kits were priced at $6,680 installed, F.O.B. BKI's plant. The kit was designed to prevent an operator from placing a body part in the press' point

of operation during the printing process. When the protective gate is opened to permit worker access, the press is stopped by the air brake system in one-quarter of a cycle. This time period is viewed as sufficient to cause the press to stop completely before a person can place a body part into the platen area. This guarding equipment is standard on all BKI presses manufactured in 1986 and afterward. BKI believes the devices comply with applicable OSHA and ANSI standards—which BKI views as minimums—and in some instances exceed these standards.

BKI determined it could not retrofit its pre–1960 presses with adequate guarding features because of an inability adequately to brake the press without a second flywheel and to mount a brake to interact with the flywheel.

BKI carried out the press guard retrofitting program in increments, starting first with its model WFE, a webflow press, because this model had proven equipment that BKI believed would work with the kit. As kits were developed for a given model BKI sent mass mailings to known model owners to advise them of the safety hazards associated with using the existing press and of the availability of the safety kit.

In 1986 BKI also caused its attorneys to give Prudhomme written notice (PX 24) of its concerns about Prudhomme's rebuilding activities. In the letter, BKI requested that Prudhomme provide it a list of businesses to whom Prudhomme had sold rebuilt presses and asked for permission to contact the businesses in order to advise them of the potential dangers of using the presses and to assure the businesses the rebuilt presses were not endorsed by BKI. BKI sent the letter to comply with what it understood to be its post-sale duty to warn.

BKI's domestic platen press sales have totaled in excess of $1 million each year for the period 1977—1988. The exact number

---

**5.** The program has reduced BKI's insurance premiums in subsequent years from its peak in 1986. BKI's insurance carrier was involved in discussions with BKI about the reasons for increased premiums but was not involved in developing the program. In 1987 the premium dropped to $500,000 and it has decreased since then based on BKI's efforts to increase the safety features for post–1960 presses and to eliminate pre–1960 presses.

of presses sold and precise sales figures are contained in a sealed exhibit (DX 50). The non-confidential portion of the trial record reflects the highest sales (by dollar amount) during this period were achieved in July 1985 to June 1986 and sales generally decreased during the remainder of the period.[6]

Defendant-counterplaintiff Prudhomme is a sole proprietor who does business as Joe Prudhomme Company. Defendant's late father, Joe, started the business in the 1940s. At age 15 Prudhomme began helping his father after school. Joe Prudhomme worked for BKI for approximately 25 years as a serviceman, traveling around the country installing KLUGE feeders and earning the nickname "KLUGE Joe." Prudhomme's father trained him; Prudhomme has, in turn, trained his two sons, who operate the business with him. Prudhomme has not had formal training or education in rebuilding, design, safety, or human factors engineering. He is familiar neither with OSHA and ANSI nor with their standards that pertain to platen presses or the work environment in which the presses operate.

Prudhomme's business consists of servicing KLUGE presses, selling press parts and supplies, and rebuilding pre- and post–1960 KLUGE presses (with the exception of BKI web flow presses and E models). Prudhomme holds himself out to the public as a specialist in KLUGE presses.

When Prudhomme rebuilds a KLUGE press he does not adhere to directives, blue prints, or specifications prepared by BKI. BKI may have provided these materials to Prudhomme's father, but it has not given them to Prudhomme. Instead, he follows the steps taught him by his father.

Prudhomme either purchases a used KLUGE press to be rebuilt and resold, or works on one owned by a printer who intends to use the press. Prudhomme then completely disassembles the press; cleans, paints, and polishes the parts; replaces or repairs broken or worn parts (using BKI-supplied or other manufacturer-supplied or machined parts); reassembles the press; adds a new motor drive system not supplied by BKI; adds a JEPCO[7] brand foil unit and another manufacturer's hot plate, die plate, and controls; adds a new start/stop switch not provided by BKI; and tests the press for four to six hours prior to resale or to placing the press in operation with the owner. Testing is performed using letter size paper as the feed stock.

The parts Prudhomme uses in the rebuilding process include a wide array.[8] The identities of his suppliers are part of the sealed portion of the record. Prudhomme does not provide his suppliers with BKI blueprints or specifications. No one from BKI inspects Prudhomme's work before a rebuilt press is placed in operation, but Prudhomme would not object to BKI's doing so.

In rebuilding certain presses the main shaft must be repaired by building it up and turning it back down. Rarely, a shaft will be replaced. When it is, Prudhomme's supplier is a source other than BKI. Sometimes a cam gear must be reground if worn out. This is performed by an outside supplier. A cam can be too worn to be remilled. Prudhomme's father sent cam gears to BKI for final determination and inspection before remilling; Prudhomme does not follow this procedure.

When Prudhomme rebuilds a KLUGE pre–1960 press he adds a JEPCO foil

---

6. Sales for the period July 1987 to June 1988 were slightly higher than sales for July 1986 to June 1987, both in terms of number of presses sold and dollar amount.

7. JEPCO is an unregistered trade name for Joseph E. Prudhomme Company. Prudhomme started manufacturing his own foil stamping unit under this name in 1985.

8. These include motors, variable pulleys, main belts, V pulley belts, motor handle shafts, foil stamping units, belt and foil stamping unit guards, hot plates, box bushings, hot plate controls, motor brackets, groove flywheels, machine shafts, studs, delivery rockers, machine shafts, cam gears, bull gears and hoses, bearings, belts, brass parts for the foil separator system, trip valves, pump parts and leathers, magazine tapes, side and center combers, tongues, rollers, bushings, bottom band assemblies, dummy and feeder feet, register cams, delivery clamps and tubes, rubber suckers, grippers, and brass sliders.

stamping unit to the press and stencils JEPCO on the foil stamper. He advertises the JEPCO foil stamper as a "KLUGE style" product because KLUGE has always been an upstanding name. Prudhomme has made certain changes to the pre–1960 KLUGE presses that he believes enhance their safety, including covering part of the flywheel and variable speed pulley. The presses on which he installs a foil stamping unit include those with only one flywheel. Prudhomme has also repainted pre–1960 KLUGE presses that BKI originally manufactured as "black" presses with a green color paint intended to match the "KLUGE green" used on post–1960 presses.

Prudhomme has used two versions of a label to identify his connection with the rebuilt KLUGE presses he sells. The first sticker (*e.g.*, PX 15I) read that the press was "Serviced By JOE PRUDHOMME COMPANY, KLUGE SPECIALIST, EQUIPMENT AND SUPPLIES." The label contained Prudhomme's business address and telephone number. It made no reference to BKI by company name. When the defendant exhausted his supply of these stickers, he began using one (*e.g.*, DX 26) that replaced the word "Serviced" with "Rebuilt." The sticker was otherwise the same in content. When Prudhomme sold a rebuilt press with a sticker that read "Serviced By" Prudhomme, the sales invoice disclosed the press was "rebuilt" and Prudhomme informed the customer the press was rebuilt and not merely serviced.

Prudhomme has also distributed an operation and maintenance manual for the use of his customers. PX 23. The document is a BKI manual to which Prudhomme has added his business name and address on the cover, a page that includes the statement, "Some 'Do's & Don'ts,'" and warnings against manually hand feeding the automatic press and putting one's hand in the press while it is running. The cannibalized manual also includes instructions regarding the use of Prudhomme's JEPCO 3 draw foil unit (the instructions are copied from BKI's foil unit manual), and a final page containing product requirements imposed by Prudhomme and disclaiming liabilities, including for injuries incurred by hand feeding the press. Prudhomme did not disclose to BKI that he had used BKI's manual in this manner.

Prudhomme also places warning stickers on rebuilt presses that state: "WARNING! *KEEP HAND OUT* OF PRESS While Press Is Running." DX 27.

Prudhomme has conducted various advertising activities to promote the sale of rebuilt KLUGE presses. One advertisement (PX 16) that appeared in *Printer's News* showed a picture of a pre–1960 KLUGE press. The ad copy stated the press—a 12″ × 18″ model—was priced at less than one-half the price of a new KLUGE machine. The press depicted in the picture was not, however, a 12″ × 18″ KLUGE press. The ad also stated the press in the picture was "Completely Rebuilt" and "WE BUY USED KLUGES" and "WE TAKE KLUGES ON TRADE." *Id.* The ad prominently identified the seller as "Joe Prudhomme Company."

Prudhomme has also advertised since 1984 in a publication called *Printers Hot Line. See* DXS 19A–19E. The advertisements introduced at trial appeared on the cover of the publication, which is sent to printers throughout the United States. The ads were run in color and the KLUGE press in each ad was painted green—the color BKI painted its post–1960 presses—although the press depicted was originally manufactured prior to 1960.

In certain of the *Printers Hot Line* advertisements (*e.g.*, DX 19A) a 12″ × 18″ press was shown in the picture but the ad claimed the press was a "Completely Rebuilt 13 × 19 Kluge Press," which is a post–1960 KLUGE. Prudhomme has advertised for sale a KLUGE foil stamping unit attached to a pre–1960 press, advising potential customers the press was available "For A Whole Lot Less Than A New Machine." *E.g.*, DX 19A. In a June 1985 advertisement the reference to a KLUGE brand foil unit was replaced with a "New JEPCO Kluge Style 3 Draw Foil Unit." DX 19B.

By at least December 1986, Prudhomme's ads made reference to "Oscha

approved" oil soaky bags under the KLUGE press pictured in the advertisement. *E.g.*, PX 19C. Oil soaky bags are a Prudhomme product designed to absorb excess oil that accumulates around a press. OSHA never formally approved the bags but Prudhomme added this statement to his advertising (which misspelled the OSHA acronym) because he talked once with someone at OSHA who said the product "sounded good."

Prudhomme uses two letterheads for his business. One (PX 10) contains a depiction of a KLUGE press foil stamped in gold. Prudhomme came up with the logo himself. The letterhead indicates Prudhomme engages in "Kluge Rebuilding Specialties" and "Rebuilt Kluges." Prudhomme has used the letterhead in correspondence for several years, starting in the late 1970s or early 1980s and BKI has never complained to him about it.

Prudhomme has also used a product brochure (DX 91) that contains the KLUGE press logo. Prudhomme showed the brochure to BKI president Henry A. Brandtjen ("Brandtjen") in 1980 or 1981; Brandtjen said the document was fine looking and looked good to him. The KLUGE depicted in the brochure is a pre–1960 press with a foil feeder attached.

Brandtjen first became aware in 1985–86 of Prudhomme's advertisements for rebuilt BKI presses. He does not normally read the *Printers Hot Line* publication. BKI has been selling parts to Prudhomme for more than 30 years. Brandtjen did not inspect a Prudhomme rebuilt press until a lawsuit was filed in Texas state court, *see* discussion *infra*, against Prudhomme and BKI jointly.

When BKI still rebuilt N model presses, it installed roll leaf feeders on heavy duty die cutting machines. At one time BKI sold roll leaf feeders to Prudhomme to install on pre–1960 presses. BKI did not show Prudhomme how to install the feeders, but it did not instruct its employees to withhold assistance from Prudhomme.

BKI makes several of its own parts. It purchases ball and rotor bearings and shafts from outside sources and acquires parts from others who manufacture the parts to BKI's specifications. BKI does not publish its product specifications and some of its parts cannot easily be reverse-engineered for duplication purposes. If Prudhomme submitted a part to BKI, it might not disclose whether the part met BKI specifications if to do so would reveal proprietary information.

Prudhomme advertises one to three times per month. BKI never contacted him prior to filing suit to complain about the contents of his advertising. Prudhomme has spent approximately $150,000 in advertising with no objection from BKI.

In approximately 1979 Prudhomme and his sons traveled to BKI's headquarters to purchase parts. BKI was moving from St. Croix Falls, Wisconsin to St. Paul, Minnesota. BKI had indicated to the industry that it might no longer produce pre–1960 press parts. Prudhomme wanted to buy the parts for use in rebuilding presses. Brandtjen personally drove Prudhomme from one to another location where BKI stored the parts. Brandtjen knew why Prudhomme wanted to buy the items but did not object to the purchase. Prudhomme still has many of these parts in his large KLUGE inventory.

Prudhomme purchased "KLUGE green" paint from BKI for use in rebuilding KLUGE presses. *See* DXS 9.2—9.6. When BKI stopped selling the paint to Prudhomme, he began purchasing paint from another supplier in a color intended to match—although different from— "KLUGE green." BKI never objected to Prudhomme's painting pre–1960 presses this color prior to the time it filed the instant suit.

In 1971 BKI established an open account for Prudhomme to order parts, *see* DX 24, and since that time Prudhomme has purchased in excess of $750,000 in parts from BKI. Prudhomme has built his business using BKI parts and relied on his ability to use the parts to establish his rebuilding business. The bulk of Prudhomme's business is selling rebuilt pre–1960 KLUGE presses.

BKI did not complain about Prudhomme's activities until the 1980s. While BKI may have had a general concern about tort liability and the safety of press operators prior to 1986, it is clear from the record that BKI first became interested in the potential adverse consequences of Prudhomme's rebuilding activities just prior to the time in 1986 that Prudhomme and BKI were sued together in Texas state court. BKI did not object to Prudhomme's use of the KLUGE trademark until then.

In the Texas lawsuit, *Frausto v. Brandtjen & Kluge, Inc. and Joe Prudhomme Co.*, plaintiff Frausto sued to recover for damages sustained to his left hand and arm. Frausto was an employee of Craftmark Products Company ("Craftmark"), to whom Prudhomme in 1981 had sold a rebuilt KLUGE model N press originally manufactured in approximately 1948.[9] In March 1984 Frausto was operating the press by hand, notwithstanding that the press had an automatic feeder. He alleged he was operating the machine in a die cutting mode, placing uncut stock[10] on the platen and positioning it with one hand and removing the stock with the other. *See* PX2 ¶ III. He contended in his suit that the press was unreasonably dangerous and defective at the time it was designed, manufactured, and placed in the stream of commerce by BKI and Prudhomme, because the press was not properly guarded to protect the operator when used in the manner intended or as foreseeably it would be used. *Id.* ¶ IV. Frausto also alleged the press was defective because there were no warnings or, alternatively, inadequate warnings regarding the dangers associated with operating the press. *Id.* Frausto sued to recover in excess of $1.5 million. *Id.* ¶ VI.

Prudhomme cross-claimed against BKI but Prudhomme was not aware of this. The attorneys who represented him were provided by his insurance carrier. He similarly did not know the carrier had settled the case for his policy limits. Prudhomme's carrier did not renew his policy and he has been unable to get further product liability insurance coverage.

Prudhomme wanted the case to be tried rather than settled. He contended Frausto had disengaged the automatic feeder and then hand-fed the press in a manner not intended. In Prudhomme's view, had the feeder been in place the operator could not have placed his hand in the point of operation. Prudhomme contends the automatic feeder is a type of guarding device, notwithstanding that the press can be operated with the feeder placed in an open position.

The press involved in *Frausto* is the first rebuilt by Prudhomme that BKI has inspected. BKI initially became concerned with Prudhomme's use of the KLUGE trademark when it determined the facts of the *Frausto* case and compared Prudhomme's activities with changing OSHA and ANSI standards.

Prudhomme sold Craftmark a KLUGE press because that is the brand Craftmark wanted to purchase and it desired a printer and die cutter. Prudhomme informed Craftmark he had rebuilt the press; the sticker affixed to it, *see* PX 15I, is one that read "Serviced By" Prudhomme and stated Prudhomme was a "KLUGE SPECIALIST." *Id.* The written price quotation provided to Craftmark identified the press as a "12 × 18 rebuilt Kluge printing and die cutting press." PX 25. Craftmark's purchase order recognized the press to be acquired is a "rebuilt Kluge." *Id.* Prudhomme also painted the press a green color even though it was originally manufactured prior to 1960.

Prudhomme knew Craftmark wanted the press in order to die cut pressure sensitive square labels. He also was aware he was selling Craftmark a single flywheel rebuilt KLUGE to perform die cutting. Prudhomme does not know if a die cutting plate was on the press when he purchased it, but

---

**9.** Prudhomme pieced together the press sold to Craftmark from two KLUGE machines; therefore, BKI can only approximate the manufacture date of the press.

**10.** According to the evidence, the stock was pressure-sensitive plastic square labels.

he concedes he probably added a new plate before selling it to Craftmark. Prudhomme did not tell Craftmark the original age of the press and neither informed BKI that he intended to sell the press nor afforded BKI the opportunity to inspect it prior to or after the sale. He would not have objected had BKI requested the opportunity to inspect the press.

Prudhomme also provided Craftmark a copy of an instruction book for KLUGE presses and feeders. PX 27. This was a BKI document to which Prudhomme affixed a label on the cover containing his company name. This label did not refer to Prudhomme as a "KLUGE specialist."

## II

The court considers first BKI's claims against Prudhomme.

### A

In order to decide this case, it is necessary as a preliminary matter for the court to ascertain which of BKI's theories of recovery are properly before the court and to determine the scope of the relief that BKI seeks.

BKI sues Prudhomme for trademark infringement and unfair trade practices. The trademark infringement claim is grounded upon § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and the common law. *See* Comp. ¶ 17. BKI's unfair trade practices claim—which the court understands to be a cause of action for unfair competition [11]—is apparently predicated upon the common law. *See id.* ¶¶ 21–27. In the Joint Pretrial Order ("PTO") the theories merge. *See* PTO ¶ I(A) at 2 ("Prudhomme's actions constitute trademark infringement and present unfair trade practices"). BKI alleges Prudhomme has committed trademark infringement and unfair competition by rebuilding,[12] advertising,

and selling pre–1960 KLUGE automatic presses in a manner likely to cause confusion, mistake, or deception regarding: first, the quality and uses of the rebuilt presses; second, the age of the rebuilt presses; third, whether the rebuilt presses are BKI products; fourth, whether Prudhomme is associated with BKI; fifth, whether BKI is responsible for the rebuilt presses; and sixth, whether the rebuilt presses meet current safety standards. *Id.* § I(A). These activities, according to BKI, damage BKI's reputation, undercut the value of its trademark, undermine its efforts to promote safe, quality products, and cause BKI to defend lawsuits involving improperly rebuilt KLUGE brand presses. *Id.*

In its complaint, BKI has denominated count three as a discrete claim for "equitable injunction." The court does not construe this count to allege a separate cause of action. The PTO, which controls over the complaint,[13] makes plain that BKI seeks to recover upon theories of trademark infringement and unfair competition. The equitable injunction count presents a request for relief predicated on the two substantive theories in the case.

The relief that BKI seeks is a matter of some confusion which the court also resolves by reference to the PTO. In the PTO, BKI asks the court to "enjoin Prudhomme's activities." *Id.* § I(A). These activities are all described in the PTO as concerning *pre*–1960 KLUGE automatic presses, *see id.*, and Prudhomme's defenses are framed in relation to such presses, *id.* § I(B). By way of evidence and argument presented during trial, however, BKI asks the court to enjoin Prudhomme from conducting similar activities in connection with *post*–1960 KLUGE presses unless the machines are updated to meet current safety standards. Because post–1960 presses are not part of the PTO, however, the propriety

---

**11.** In the Joint Pretrial Order ("PTO") this theory of recovery is also described as one for "unfair competition." *See* PTO §§ III(B) & IV [BKI's Issues] (2). The court therefore refers to it as an unfair competition claim in this opinion.

**12.** In this opinion the court uses the term "rebuilding" to include product "remodeling" and "remanufacturing."

**13.** *See Conti v. Sanko S.S. Co., Ltd.,* 912 F.2d 816, 818 (5th Cir.1990) (joint pretrial order superseded any previous pleadings on file in the case).

of rebuilding and selling these machines is not before the court for decision.[14]

■ BKI also introduced evidence that Prudhomme has distributed KLUGE press operator manuals that contain Prudhomme markings and modifications but are substantially composed of manuals originally produced by BKI. The court does not interpret this to be a separate claim of reverse palming off.[15] Instead, BKI appears to offer this evidence as constituent proof of its broader trademark infringement and unfair competition claims. Because the PTO does not specify that BKI seeks relief regarding the manuals, the court does not separately determine whether BKI is entitled to enjoin any reverse palming off.

BKI lists in the PTO as a contested issue of law—but not in its summary of claims—whether it is entitled to an injunction requiring Prudhomme to notify all purchasers to whom he sold rebuilt KLUGE presses that the machines are neither sponsored by BKI nor is BKI responsible for any safety or quality problems associated with the press. *See id.* § IV [BKI's Issues] (4). BKI also delineates as contested issues of law—but not in its claims summary—two requests for declaratory judgment. *See id.* § IV [BKI's Issues] (5) & (6). The court interprets these requests for relief to be predicated upon the same theories as BKI's request for prohibitory injunctive relief. The court does not therefore address them separately and its decision regarding an injunction against Prudhomme's rebuilding activities extends to these forms of requested relief.

Having determined the theories and requests for relief that are properly presented for decision, the court now turns to BKI's trademark infringement and unfair competition claims to decide if BKI is entitled to an injunction with respect to Prudhomme's rebuilding, advertising, and selling of pre–1960 KLUGE automatic presses.

**B**

■ In order to show it is entitled to the injunctive relief it seeks, BKI must prove the KLUGE trademark is eligible for protection, that BKI is the senior user, that there is a likelihood of confusion between BKI's mark and Prudhomme's mark, and that the likelihood of confusion will actually cause BKI irreparable injury for which there is no adequate legal remedy. *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.,* 909 F.2d 839, 844 (5th Cir.1990). There is no dispute in the present case that BKI's trademark KLUGE is eligible for protection or that BKI is the senior user. The question for decision—like the gravamen of any action for trademark infringement or common law unfair competition, *see id.*—therefore becomes whether the challenged mark is likely to cause confusion.[16] A trademark owner "may not enjoin others from using the mark if the likelihood of confusion between his product and the infringer's product is minimal or non-existent." *Id.* at 843.

■ The likelihood of confusion test inquires whether the defendant's use of the plaintiff's trademark would likely create confusion in the minds of potential buyers as to the source, affiliation, or sponsorship

---

**14.** Alternatively, if post–1960 presses are properly the subject of trial, the court denies BKI the relief it requests for the reasons stated regarding pre–1960 presses.

**15.** Reverse palming off occurs when one party directly misappropriates the services or goods of another and identifies them as his own. *See Roho, Inc. v. Marquis, Inc.,* 902 F.2d 356, 359 (5th Cir.1990), *vacating* 717 F.Supp. 1172 (E.D. La.1989).

**16.** "Unfair competition is a broader area of the law than statutory trademark infringement." *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir.) (citing *B.H. Bunn Co., Inc. v. AAA Replacement Parts Co., Inc.,* 451 F.2d 1254 (5th Cir.1971)), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Trademark infringement is one variety of unfair competition. *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 701 (5th Cir. Unit A 1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Both theories, however, require proof of likelihood of confusion. *See Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.,* 676 F.2d 1079, 1086 (5th Cir.1982) (both trademark infringement and unfair competition turn primarily on the likelihood of customer confusion).

of the parties' products. *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). The test is *likelihood* of confusion. Therefore, evidence of actual confusion is not necessary to a finding of likelihood of confusion, *id.* at 173, notwithstanding that evidence of such confusion is the best evidence of likelihood of confusion. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). Likelihood of confusion is determined in the context of the typical purchaser of the product in question. *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 500 n. 5 (5th Cir.), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979).

In this circuit the determination of likelihood of confusion has traditionally turned upon consideration of certain factors. These were known in earlier cases as seven "digits-of-confusion," *see Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 430 (5th Cir.1984); *B.H. Bunn Co., Inc. v. AAA Replacement Parts Co., Inc.*, 451 F.2d 1254, 1262 (5th Cir.1971) ("we think of this case as a series of digits to be added together"), and have now evolved into these eight factors: (1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) the degree of care exercised by potential purchasers. *Oreck*, 803 F.2d at 170. Both BKI and Prudhomme have assumed the applicability of a likelihood of confusion requirement to BKI's trademark infringement and unfair competition claims. *See* PTO §§ I(A) & (B), III(A1)(3) & (B)(2). Neither has argued that the traditional Fifth Circuit factors do not apply.

■ The court thinks it necessary, however, to decide as a threshold matter whether these elements should yield to others in the context of a rebuilt product case and whether particular digits are entitled to greater or lesser weight. There is, to be sure, considerable latitude available to the factfinder in considering and weighing the traditional octinary factors. The elements are recognized in this circuit as being non-exclusive, *see, e.g., Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 149 (5th Cir.1985), no one factor is dispositive and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved, *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir. 1985) (per curiam), and the plaintiff need not support a claim by a majority of the factors, *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1159 (5th Cir.1982). Because the weight to be given to the various factors is a matter for the factfinder, "as long as it appears that all relevant proffered evidence was considered and that no impermissible inferences were drawn from that evidence, the factfinder's determination will not be overturned unless clearly erroneous." *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345–46 n. 9 (5th Cir.1984). Nevertheless, this action falls within what one court has called "a well-recognized category of trademark infringement, involving goods that originally were made by one party and that later were repaired and reconditioned by another party and resold under the original marks." *Joy Mfg. Co. v. CGM Valve & Gauge Co., Inc.*, 730 F.Supp. 1387, 1395 (S.D.Tex.1989). It is therefore necessary before turning to the facts bearing on the issue of likelihood of confusion to decide whether the familiar Fifth Circuit legal framework for determining likelihood of confusion applies in this context.

The appropriate starting point for this analysis is two Supreme Court decisions. In *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924), a trademark owner sued to restrain the use of its trademark upon toilet powders and perfumes. *Id.* at 366, 44 S.Ct. at 350. The defendant purchased plaintiff's genuine powder, subjected it to pressure, added a binder to give it coherence, and sold it in a metal case. *Id.* The defendant similarly bought plaintiff's genuine perfume and bottled and sold it in smaller bottles. *Id.* at 366–67, 44 S.Ct. at 350–51.

The district court entered a decree that permitted the defendant to sell the rebottled perfume on the condition that it label the product with a disclaimer of any connection with the plaintiff. *Id.* at 367, 44 S.Ct. at 351. The decree permitted the defendant to make compacts from plaintiff's genuine loose powder, provided the container was likewise labeled with disclaiming language. *Id.* The circuit court reversed, entering instead an injunction precluding the use of the trademark except on the original packages as marked and sold by the plaintiff. *Id.*

On certiorari to the Supreme Court, the Court held the defendant, by virtue of its ownership, had a right to compound, change, or divide the products it purchased and resell the products as modified. *Id.* at 368, 44 S.Ct. at 351. Writing for the Court, Justice Holmes reasoned in pertinent part that when a trademark "is used in a way that does not deceive the public," the trademark owner may not "prevent its being used to tell the truth." *Id.* Therefore, defendant could use plaintiff's trademark collaterally to say the trademarked product was part of what was offered by the defendant as new and changed. *Id.* at 369, 44 S.Ct. at 351.

*Coty* served as a predicate for the Court's seminal product rebuilding decision in *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947). There the principal issue was whether a seller of repaired or reconditioned spark plugs should be ordered to remove plaintiff's trademark from the spark plugs and their packaging. *See id.* at 128, 67 S.Ct. at 1138. The Court recognized there could be cases "where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words 'used' or 'repaired' were added." *Id.* at 129, 67 S.Ct. at 1138. But the Court also observed that inferiority is expected in most secondhand articles and

they therefore generally cost the customer less. *Id.* at 129–30, 67 S.Ct. at 1138–39. Product inferiority is thus immaterial "so long as the article is clearly and distinctly sold as repaired or reconditioned rather than as new." *Id.* at 130, 67 S.Ct. at 1139 (footnote omitted). On the basis of the rule of *Coty,* the Court held use of the trademark by a rebuilder or repairer "is wholly permissible so long as the manufacturer is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the dealer." *Id.* The Court therefore declined to require the reseller to remove the manufacturer's trademark from the spark plugs and packaging because the decree entered by the circuit court—which required certain product and package labeling—served the requirements of full disclosure. *Id.* at 130, 67 S.Ct. at 1139.

The court has located one Fifth Circuit case that cites *Champion. See Singer Mfg. Co. v. Briley,* 207 F.2d 519 (5th Cir. 1953). *Briley* appears to predate the era when the current likelihood of confusion factors came into general use in this circuit.[17] And the circuit court apparently had no occasion there to consider any issue other than the adequacy of the relief accorded by the district court. *See id.* at 521 & 521–22 n. 4. The district court had recognized the rule of *Champion,* and had permitted the defendants to repair, renovate, rebuild, and resell plaintiff's trademarked sewing machines so long as the products were plainly and truthfully labeled. *Id.* The circuit court affirmed the order, modifying it only to enable the trademark owner to seek additional relief if the decree were shown not to afford it an effective remedy. *Id.* at 522.

Apparently one Fifth Circuit district court has, in a published opinion, decided a trademark case involving the sale of a rebuilt product under the original trademark.[18] In *Joy Mfg. Co.* the court conclud-

---

**17.** The Restatement of Torts § 729 (1938), from which certain of the factors are derived, did precede *Briley.*

**18.** Another Fifth Circuit district court in *Roho, Inc. v. Marquis,* 717 F.Supp. 1172, 1175–76 (E.D.

La.1989), *vacated,* 902 F.2d 356 (5th Cir.1990), cited the rules of *Coty* and *Champion* but found the cases inapposite in the context of that case. The court in *Engineered Mechanical Servs., Inc. v. Applied Mechanical Technology, Inc.,* 591

ed as a matter of law that the defendant's use, on its reconditioned valves, of unauthorized nameplates bearing the original manufacturer's trademark, and the defendant's failure to mark the valves as used or reconditioned, created a substantial likelihood of confusion as to the true status of the valves. 730 F.Supp. at 1395. The court did not purport to decide the likelihood of confusion question in accordance with the eight-part formulation.

■■■ This court concludes the traditional likelihood of confusion octad is an appropriate starting point for determining this issue in a rebuilt product case. The court also holds that the jurisprudence supports the addition of other elements to make the test more analytically useful to this subset of trademark infringement and unfair competition claims.

Retention of the factors that compose the current formulation is surely appropriate since these are deemed to be non-exclusive, the weight to be accorded a given digit may vary according to the facts of a case, and a plaintiff need not satisfy any particular number of elements. There is no persuasive reason to jettison venerable digits of confusion that have afforded predictably to this area of law. At the same time, a rebuilding case is sufficiently unique to trademark infringement and unfair competition jurisprudence that additional considerations should become standard in these cases. Certain of the elements in the usual formulation appear categorically to be of little value when determining likelihood of confusion in the case of a rebuilt product sold under the original trademark. For example, an evaluation of the strength of the plaintiff's mark and of the similarity of design between marks—which compose the first two digits—would appear deserving of little attention in the

typical rebuilt product case. The essence of such an action is that the rebuilder is selling under the manufacturer's trademark a rebuilt product of the manufacturer's original making. Digits one and two offer little guidance. Other elements not now included in the test, however, should inform the court's likelihood of confusion finding in the typical rebuilt product case. *Champion* and its progeny support adding these three factors to the other eight: (9) the extent and nature of changes made to the product; (10) the clarity and distinctiveness of the labeling on the rebuilt product; and (11) the degree to which any inferior qualities associated with the reconditioned product would likely be identified by the typical purchaser with the manufacturer. The court adopts them today.[19]

**C**

■■■ As the court turns to the trial record to decide whether BKI is entitled to prevail, it bears emphasis that BKI must prove by a preponderance of the evidence a likelihood of confusion on the part of a typical purchaser as to the source, affiliation, or sponsorship of Prudhomme's rebuilt pre–1960 KLUGE automatic presses. This general proof standard is pertinent in the case of a rebuilt product sold under the original trademark because, as the Supreme Court explained in *Champion,* the inferiority of a secondhand product is immaterial so long as the article is clearly and distinctly sold as repaired or reconditioned rather than as new. 331 U.S. at 130, 67 S.Ct. at 1139. BKI's six complaints about Prudhomme's product and activities pertain to customer misunderstandings regarding the quality, uses, and age of the rebuilt presses, BKI's alleged association with Prudhomme and the rebuilt presses and apparent responsibility for the Prudhomme

F.Supp. 962, 965 (M.D.La.1984), cited *Champion* for its holding regarding the availability of an accounting. In *C.M. Paula Co. v. Logan,* 355 F.Supp. 189, 193 (N.D.Tex.1973) (Mahon, J.), the court cited *Coty* to impose a labeling requirement in a copyright infringement action.

19. The court discerns no inequity to the plaintiff in adopting these factors after the case was tried. The new factors are, in the court's view,

more precise expressions of general considerations contained in other factors. To the extent BKI directed its evidence to the other elements, it did so as to these. Moreover, BKI did not purport expressly to fulfill the eight-part test by its proof. The court has not, therefore, deprived it of an opportunity to focus its presentation on additional factors that the plaintiff intentionally did not attempt to satisfy.

machines, and confusion, mistake, and deception regarding whether the presses meet current safety standards. But if there is no likelihood of confusion as to the source of the presses and BKI's affiliation with, sponsorship of, or responsibility for Prudhomme and his products, then it is immaterial that typical customers may be confused, mistaken, or deceived in the respects alleged. This is so because typical purchasers will not translate their dissatisfaction to BKI and the value of BKI's trademark will not suffer.

### 1

 As noted, the first two factors—strength of BKI's trademark and similarity of design—are of little value and thus merit brief discussion. It is undisputed that the KLUGE trademark is an arbitrary mark entitled to greatest protection [20] and that Prudhomme sells rebuilt pre–1960 KLUGE automatic presses that bear the actual KLUGE mark that BKI placed on each press at the time of manufacture.

### 2

The court evaluates next the fourth, fifth, and seventh digits: identity of retail outlets and purchasers, similarity of advertising media used, and actual confusion. BKI offered little evidence pertinent to most of these factors; the evidence that was adduced weighs against a finding of likelihood of confusion by the typical purchaser.

The presses in question are not sold through retail outlets. The purchasers of both products are printers, but the record does not disclose whether those who purchase newer KLUGE brand presses typically buy rebuilt pre–1960 KLUGE machines as well.

The record suggests BKI and Prudhomme do not use the same advertising media. Prudhomme relies heavily on print advertising in *Printers Hot Line.* The evidence does not reflect that BKI advertises in a similar medium. Given the apparent disdain that BKI president Brandtjen showed for this type of publication, it is a reasonable inference from the evidence that BKI does not advertise in the same or similar publications. The testimony also disclosed that BKI employs a sales force. BKI did not produce evidence that Prudhomme and his sons perform sales calls to the same extent or in a similar manner.

 Evidence of actual confusion is not necessary to prove likelihood of confusion. *Amstar,* 615 F.2d at 263. But because actual confusion is "patently the best evidence of likelihood of confusion," *Falcon Rice Mill,* 725 F.2d at 345 (quoting *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 704 (5th Cir. Unit A 1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982)), it is probative of the absence of likelihood of confusion that BKI did not introduce evidence of one instance in which a typical purchaser was confused as to the source, affiliation, or sponsorship of a pre–1960 KLUGE automatic press rebuilt and sold by Prudhomme.[21]

Considering these factors, the court finds a typical purchaser is not likely to be confused regarding the source, affiliation, or sponsorship of Prudhomme's rebuilt pre–1960 KLUGE automatic presses.

### 3

 The sixth factor is Prudhomme's intent. Intent to pass off one's goods as those of another can provide compelling evidence of likelihood of confusion. *See Oreck,* 803 F.2d at 173. The record does not support a finding that Prudhomme intended to mislead purchasers as to source, affiliation, or sponsorship of his presses.

The evidence regarding Prudhomme's intent generally divides into three areas: the

---

**20.** "Arbitrary and fanciful terms or phrases are those which are either coined words or words which are not suggestive of the product or service." *Union Nat'l Bank,* 909 F.2d at 845. In the trademark context, arbitrary "refers to ordinary words which do not suggest or describe the services involved." *Id.* As applied to a printing press, "KLUGE" is arbitrary.

**21.** The court does not view the *Frausto* lawsuit as evidence of actual confusion by a typical purchaser. The plaintiff in that case was a press operator, not the press purchaser.

content of his advertising; the composition of his machine stickers, letterhead, brochures, manuals, and sales documents; and his use of "KLUGE green" paint on pre–1960 rebuilt KLUGE presses.

■ The court finds that Prudhomme's advertising does not manifest an intent to deceive typical purchasers. The advertisement depicted in PX 16 is typical of others in the record and illustrates no intent to deceive can be inferred. The ad discloses in several ways that Prudhomme is an independent rebuilder. The name of his company is prominently displayed; no reference is made to BKI's corporate name and no company logo is used.[22] The presses are described as "Completely Rebuilt" and it is said they can be delivered and installed for "Less than ½ the price of a new machine." The copy also claims that Prudhomme has a "Full Inventory of parts for our customers," buys "USED KLUGES," takes "KLUGES ON TRADE," and has "35 years experience rebuilding Kluges." These are statements that derive from one who is not affiliated with or sponsored by BKI. They reflect an intent to compete in the market by reselling KLUGE presses that have been purchased or taken in trade and rebuilt.

■ BKI did demonstrate certain inaccuracies in Prudhomme's advertising. One error was the repeated reference to a 13″ × 19″ press accompanied by a picture of a 12″ × 18″ machine. *E.g.*, DX 19A. But the evidence also establishes that Prudhomme recognized this mistake and sought to correct it. In fact, in several successive ads beginning in August 1986, *see* DX 19C, the *Printers Hot Line* itself incorrectly changed the copy so that the press was described as measuring "13 × 18." BKI did not prove that Prudhomme intended to deceive the typical purchaser by his advertising.

A series of Prudhomme ads also contained references to OSHA approval. These were not intended, however, to convey approval of the press depicted. The pertinent copy reads: "Notice the Oil Soaky Bags under this Press. No more cleaning oil under your press. Let the Oil Soaky do it for you. (Oscha approved.)" Prudhomme intended the reference to OSHA approval to pertain to Prudhomme's oil soaky bag product, and not to the press itself. This representation is highly questionable, but does not avail BKI a right to relief.

The contents of Prudhomme's machine stickers, letterhead, brochures, manuals, and sales documents do not indicate by a preponderance of the evidence an intent to deceive.

■ For a period of time Prudhomme affixed stickers to his rebuilt presses that stated the machines were "serviced" by him. But the purchasers were informed in written sales quotations, *e.g.*, PX 25, and orally that the presses were rebuilt. When his supply of this label was exhausted, Prudhomme replaced it with one that reads "rebuilt" by Prudhomme, which he currently uses. Neither version of the label contains BKI's corporate name or address. Prudhomme refers to his company as being a "KLUGE specialist," but he couples with this term a reference to "equipment and supplies." This practice reflects no intent by Prudhomme to mislead typical press purchasers regarding the source, affiliation, or sponsorship of his presses.

Prudhomme's letterhead and brochures contain a depiction of a KLUGE press foil stamped in gold. His letterhead states he is engaged in "Kluge Rebuilding Specialties" and "Rebuilt Kluges." The court finds no intent to deceive on the basis of the contents of these documents. Prudhomme intends to convey his actual business as an independent tradesman who rebuilds and sells KLUGE brand presses he has acquired.

■ Prudhomme's press manuals do consist of obvious combinations of BKI

---

**22.** This case does not involve facts similar, for example, to *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 910–11 (Fed.Cir.1984), where an independent dealer's use of a manu- facturer's logo in advertising was alleged to confuse prospective customers as to whether the dealer was part of the manufacturer's organization.

product manuals and Prudhomme's modifications. The court is satisfied Prudhomme does not intend to pass off his product as manufactured by BKI without modification by Prudhomme. The manual was nothing more than an unsophisticated and benign effort by a rebuilder to produce a product manual. In the context of the totality of Prudhomme's advertising and representations regarding his products, this evidence does not persuade the court that Prudhomme intended by his isolated attempt at a makeshift document to mislead purchasers. Such an intent is inconsistent with his other disclosures regarding the true nature of his activities.

4

The next factors the court evaluates are the third and ninth: similarity of products and the extent and nature of changes made to plaintiff's product. The third factor derives from the traditional formulation for likelihood of confusion followed in the Fifth Circuit; the ninth digit is one the court adopts on the basis of *Champion*'s recognition that the reconditioning of or repair to a product can be so extensive that it would be a misnomer to call the article by its original name. *See* 331 U.S. at 129, 67 S.Ct. at 1138.

BKI appears to support its position on these factors on two grounds: first, Prudhomme's use of alternate parts is so extensive that it is improper to call the rebuilt machines KLUGE presses, citing *Briley*, 207 F.2d 519, and *Singer Mfg. Co. v. American Appliance Co.*, 86 F.Supp. 737, 739 (N.D.Ohio 1949); and second, Prudhomme has added peripheral devices to pre–1960 single fly wheel automatic KLUGE presses that were not intended for these machines, will confuse purchasers as to the source or approval of the presses, and pose performance and worker safety problems. The

court declines to find likelihood of confusion on the basis of either argument.

■■■ BKI apparently argues in a pristine sense that, once a product crosses a certain threshold of modification, the trademark holder can preclude use of its trademark. But the "misnomer" concept addressed in *Champion* does not reach this far. At its core, *Champion* is concerned with protecting the value of trademarks by ensuring that the inferior qualities of secondhand goods are not associated with the trademark owner. Consonant with this intent, the Court recognized in *Champion* that a product may be so extensively or fundamentally altered that the trademark no longer has any relevance to the product. *Champion* does not abrogate the requirement of likelihood of confusion. Rather, by recognizing that a product can be altered to such an extent that a typical purchaser cannot disassociate the product's inferior qualities from the trademark holder, the Court captures the essence of likelihood of confusion.

■■■ In the rebuilt press market that is the subject of the court's present inquiry, the court cannot say it is a misnomer to call a Prudhomme rebuilt press a KLUGE. BKI failed to prove that typical purchasers are likely to transfer to BKI their opinions about Prudhomme's work.

BKI did establish at trial that Prudhomme obtains a variety of substitute parts for his rebuilt presses, that the parts often are procured without reference to whether they meet BKI specifications, and that BKI has no right to approve the substitute parts. BKI did not prove, however, what Singer Manufacturing Co. did in *Briley* and *American Appliance*. In those cases sewing machines were sold to a buying public that apparently consisted of typical sewing machine users.[23] Singer established the changes to its machines were so extensive that appropriate labeling should be required.[24] But these cases—unlike to-

---

**23.** *Briley* does not specify who was alleged to make up the buying public; *American Appliance* indicates the sewing machines "were ordinarily sold through retail outlets . . . or through leased departments in various stores," 86 F.Supp. at 739, thus suggesting their sale to typical sewing machine users.

**24.** In neither case did the court enjoin rebuilding and sale of the machines, which is the principal relief BKI requests in the present case.

day's facts—did not involve more sophisticated purchasers who carefully scrutinize the acquisition of big ticket items.

■ As the court explains *infra* in § II(C)(5), it is a reasonable inference from the evidence that typical press purchasers are more knowledgeable and circumspect buyers who know when they acquire an older model rebuilt KLUGE press that it likely has been reconditioned with substitute parts. BKI certainly did not establish the converse of this proposition. It is therefore a fair inference from the record that typical purchasers would not likely confuse Prudhomme's work with BKI itself.

■ BKI also urges that Prudhomme's installation of foil stamping devices and embossing and die cutters on single fly wheel printing presses, for which such devices were not intended, fundamentally alters the identity of the product, and poses performance and worker safety problems that will erroneously be transferred to BKI. The court observes initially that Prudhomme now identifies his foil stamper as a JEPCO brand product. There is no persuasive evidence that this unregistered mark is likely to be or is in fact associated by the typical purchaser with BKI or the KLUGE mark. But of greater consequence to BKI's claim, the record is replete with evidence that these printing functions came into vogue in the industry well after the pre–1960 KLUGE automatic presses in question were manufactured. It is therefore a reasonable inference from the record—especially in light of the dearth of evidence to the contrary—that the typical press purchaser understands he is acquiring a rebuilt press with secondary market attachments that were not part of the original press. BKI has not proven that the typical purchaser would likely be confused as to the true source of these aftermarket additions since BKI did not sell them at the time of original manufacture and because the rebuilt presses clearly emanate from a rebuilder who logically could be thought to alter the machine during the process of "completely rebuilding" it.

■ Nor does the court find that Prudhomme's application of green paint to pre–1960 presses, coupled with the installation of ancillary devices, heightens the likelihood of confusion. This color distinction is not borne out by the record insofar as it relates to purchasers' knowledge. Because BKI knows the difference in its use of colors, it is particularly sensitive to the misapplication of one paint color to presses of a different era. BKI did not prove that typical purchasers so readily identify KLUGE presses by color that they would on that basis confuse one generation of machine with another.

5

The court next analyzes the eighth, tenth, and eleventh factors: the degree of care exercised by typical purchasers, the clarity and distinctiveness of the labeling on the rebuilt product, and the degree to which any inferior qualities associated with the reconditioned product would likely be identified by the typical purchaser with the manufacturer.

■ The court turns initially to the question of the typical purchaser's degree of care. It is significant that the products involved in this case are not low price, retail-type items. The typical purchaser does not buy on impulse or without some extended consideration. BKI's president conceded this in his testimony. The evidence regarding the Craftmark sale, for example, showed that Prudhomme first presented a proposal, PX 25, following which Craftmark purchased the press for a price in excess of $10,000. The evidence supports a finding that the typical purchaser is careful and discerning, and would not likely be confused as to the true nature of the Prudhomme product.

■ Likelihood of confusion can be found to be absent where the typical purchaser is sophisticated. *See Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 776 (5th Cir.) (Rubin, J., dissenting) (no confusion among industrial purchasing agents), *cert. denied*, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). When a

**1572**

product is of relatively high cost, the customer presumably is more likely to investigate before purchasing. *See Armco*, 693 F.2d at 1160–61. A recent Fifth Circuit decision "assume[d] the purchasers of presses to be sophisticated about printing" and noted "that presses, which cost tens of thousands of dollars, are not bought on impulse, but rather with a great deal of care." *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha and Graphic Mach. Int'l, Inc.*, 754 F.2d 591, 595 (5th Cir.1985).[25]

■ The court next analyzes the clarity and distinctiveness of product labeling. The evidence reflects that Prudhomme labels his rebuilt presses with a decal that plainly states the product is "rebuilt" by Prudhomme. The court discerns no likelihood of confusion deriving from Prudhomme's current labeling. Even when he formerly used a label that stated the press was "serviced" by him, Prudhomme plainly advised the purchaser the press was rebuilt and sold the press as rebuilt. There is no evidence in the trial record that any purchaser of a press with a label attached that read "serviced" by Prudhomme believed he bought anything other than a rebuilt press.

■ BKI challenges Prudhomme's use on press labels and otherwise of the terms "KLUGE specialist." But the record does not support an inference that the typical press purchaser would likely think BKI sponsors or associates itself with Prudhomme. Instead, the more reasonable conclusion is that such a purchaser would understand Prudhomme to represent he has special expertise with respect to a press of venerable stature in the industry. *Cf. Excalibur Automobile Corp. v. Elite Autoworks, Inc.*, 733 F.Supp. 65, 66 (E.D.Wis. 1990) (court declined to enjoin defendant's advertising as "specialist" in trademarked product where defendant did not purport to deceive public regarding manufacturer's connection with product).

■ As to the eleventh digit, the court does not find that the usual purchaser would likely associate with BKI any inferior qualities of a Prudhomme rebuilt press. The advertising that Prudhomme employs illustrates what the court infers from the evidence to be the mindset of the typical purchaser of a rebuilt press. Prudhomme advertises in *Printers Hot Line* that his presses are "completely rebuilt" and are available "for a whole lot less than a new machine." As the Court observed in *Champion*, those who purchase used goods for a significant price discount generally recognize the product will not perform as it did when new. *See* 331 U.S. at 129, 67 S.Ct. at 1138. And it is reasonable to assume that purchasers attribute any dissatisfaction with their purchase to the rebuilder—here Prudhomme—rather than with the original manufacturer.

BKI introduced evidence that Prudhomme sold a single fly wheel pre–1960 press to Craftmark under the description "rebuilt Kluge printing and die cutting press." PX 25. BKI contends this is a cause of likelihood of confusion because this model press was not manufactured to perform die cutting and cannot truthfully be described as a "die cutting press." The critical inquiry, however, is whether the typical purchaser would attribute to BKI any dissatisfaction with inferior qualities of the product. There is no evidence that Craftmark, the product purchaser, is in any way dissatisfied with the die cutting capabilities of the rebuilt press Prudhomme sold it. And there is no other basis in the trial record for the court to find that a typical purchaser—even if displeased in this regard—would likely transfer its feelings to BKI.

---

**25.** In *Fuji* the circuit court did not find these facts to be determinative of the trademark infringement issue, however. The products that were the subject of the infringement action were graphic arts materials of negligible cost, not printing presses. *See* 754 F.2d at 596. The circuit court's observations regarding printing press purchasers are nevertheless appropriate in the context of today's case, for the court distinguished between the care that printers take in purchasing a major item like a press versus the scant attention they give to the acquisition of printing supplies. *See id.*

6

Having considered all the pertinent factors, the court finds as a matter of fact that a typical purchaser is not likely to be confused as to the source, affiliation, or sponsorship of Prudhomme's rebuilt pre–1960 KLUGE automatic presses. As in *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1083 (5th Cir.1982), in this case BKI "simply failed to prove that there was any likelihood of confusion." It is not entitled, therefore, to prevail on its trademark infringement and unfair trade practices claims. *See id.* at 1085 (Fifth Circuit cases insist upon likelihood of confusion and, by doing so, reject any notion that trademark is owner's product to be protected irrespective of its role in operation of markets).[26]

D

Given the type of evidence BKI has introduced, the decisions it has cited in its case law outline, and the absence of any express effort to address the usual digits of likelihood of confusion, it is conceivable that BKI argues for a *per se* right—divorced from the context of likelihood of confusion—to control the rebuilding and sale of rebuilt products bearing its trademark. BKI points to three cases that it contends support a right to control the quality of its presses and, in turn, to warrant an injunction forbidding Prudhomme from rebuilding and reselling pre–1960 KLUGE automatic presses because the machines cannot be made safe: *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987); *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131 (D.Colo.1980); and *Broan Mfg. Co., Inc. v. Associated Distributors, Inc.*, 923 F.2d 1232 (6th Cir.1991). BKI makes no attempt to distinguish the rule of *Champion* that the sale of rebuilt products under the original trademark is "wholly permissible" with proper labeling. *See* 331 U.S. at 130, 67 S.Ct. at 1139. BKI essen-

tially argues that, because it may be required to defend lawsuits brought by operators injured while using pre–1960 rebuilt presses, it may invoke its trademark rights to bring the rebuilding process to a halt. The court's careful examination of BKI's authorities discloses these cases are distinguishable on two important grounds.

First, all the decisions involved findings of trademark infringement, which each court assumed required a showing of likelihood of confusion. *See El Greco Leather*, 806 F.2d at 395 (recognizing likelihood of confusion necessary for trademark infringement); *Coors*, 486 F.Supp. at 134 (parties stipulated[27] that defendant sold plaintiff's beer "in the original containers so as to be identical in appearance" to that sold by plaintiff and "the public has no means of distinguishing between the two"); *Broan*, 923 F.2d at 1238–39 (circuit court noted copies were "outwardly almost identical," there was significant evidence the copies were "routinely confused" with plaintiff's genuine products, and there was evidence that personnel in a retail store that had sold both plaintiff's and defendants' products—and who were "presumably familiar with both"—had mistakenly sent copies to plaintiff for returned product credit).

Second, each case involved the sale of plaintiff's original goods or intentional copies, not rebuilt, repaired, or reconditioned products sold under plaintiff's original trademark.

The holdings of *El Greco Leather* that BKI emphasizes for the court must therefore be viewed in their proper context. The Second Circuit did decide that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." 806 F.2d at 395. It similarly ruled that "[t]he holder of a trademark is entitled to require ... that no merchandise be distributed without its first being in-

---

**26.** As defenses, Prudhomme urges that BKI's right to relief is barred by laches and acquiescence. The court does not reach these questions.

**27.** The opinion indicates at 486 F.Supp. at 132 that this is a stipulated fact.

spected by the holder or its agent to insure quality." *Id.* But *El Greco Leather* involved a suit by a manufacturer to enjoin the sale of new products sold under their original trademark. The plaintiff had contracted with a foreign shoe factory to manufacture shoes bearing the plaintiff's mark. *Id.* at 393. Due to dissatisfaction with the factory's performance, the plaintiff cancelled its order for two lots of shoes that had already been manufactured. *Id.* at 394. The factory then sold the shoes—still bearing plaintiff's trademark—to the defendant, who in turn sold them in competition with the plaintiff. *Id.* The circuit court was eminently correct in holding the manufacturer had the right to require inspection of these goods and to control their quality. But the shoes were not secondhand repaired or reconditioned goods, they were new. The *El Greco Leather* court therefore had no occasion to determine how the rule of *Champion* would bear on its decision and, indeed, it would appear the jurisprudence regarding rebuilt products had no relevance to the case.

*Coors* is similarly distinguishable. The defendant sold plaintiff's genuine beer in its original container but allowed the product to deteriorate because of an absence of necessary refrigeration. 486 F.Supp. at 133. This resulted in the sale to the public of plaintiff's beer in an unfit condition and of inferior quality. *Id.* The *Coors* court did recognize a limitation on the right to resell a trademarked product. *Id.* at 136. In doing so it cited, but did not discuss, the Supreme Court's *Coty* and *Champion* decisions, *id.*, relying instead on a Sixth Circuit opinion that predated *Champion*. But even if this court were to find the *Coors* court's analysis somewhat imperfect, the fact remains that *Coors* involved the sale of plaintiff's original product in its original container. The holdings of the case do not, therefore, guide today's decision involving rebuilt presses plainly sold as rebuilt. *Coors* cannot be read to grant to an original manufacturer a broad *per se* right of control that extends to rebuilt products.

Finally, the Sixth Circuit's recent *Broan* decision does not justify BKI's position. BKI cites *Broan* as authority for making

the consequences of potential product liability claims relevant to the trademark owner's right of control over a rebuilt product sold under its original trademark. The Sixth Circuit upheld a right to recover damages for erroneous product liability claims brought against a trademark owner for defects in a copied product manufactured and sold by others. 923 F.2d at 1238–39. But *Broan* did not pertain to the sale of reconditioned goods. The defendants in that case distributed a "knock-off" product manufactured by a foreign manufacturer. *Id.* at 1234, 1237. The copies of plaintiff's product were "nearly exact." *Id.* at 1234. They were not sold under the plaintiff's trademark, although the product packaging was nearly identical and the goods were sold from the plaintiff's point of sale displays at a major retailer of plaintiff's products. *Id.* The *Broan* court neither addressed *Champion* and its progeny nor the question whether a manufacturer may control the rebuilding and resale of its goods to avoid product liability suits.

At bottom, these cases do not support the contention that a trademark owner may regulate the rebuilding and resale of its products in the absence of proof of trademark infringement and unfair competition. The court declines to adopt such a theory in the present case.

### III

The court next addresses Prudhomme's counterclaim for tortious interference with actual and prospective contracts. Prudhomme alleges BKI committed these torts when it sent letters (DXS 29.2, 30–32, and 34) to KLUGE press owners warning that KLUGE brand machines manufactured prior to 1960 do not meet current safety standards, that BKI knows of no way (or no practical way) to bring the presses up to current OSHA and/or ANSI safety requirements, and the presses should immediately be removed from production and scrapped or traded in on a new machine, in which case BKI will scrap the old KLUGE.

## A

■ Prudhomme failed at trial to prove tortious interference with existing contracts. Prior to trial Prudhomme based this counterclaim on two contracts: one with Trade, Inc. and one with Quality Letter Press # 116. *See* PX 32, Ans. to Int. No. 10. Under Texas law, in order to establish this tort a plaintiff must prove there was a contract subject to interference, the act of interference was willful and intentional, such intentional act was a proximate cause of the plaintiff's damage, and actual damage or loss occurred. *Frost Nat'l Bank v. Matthews*, 713 S.W.2d 365, 369 (Tex.App.1986, writ ref'd n.r.e.). Prudhomme introduced no evidence at trial that BKI's letters had any bearing on a decision by Quality Letter Press # 116 not to perform a contract with Prudhomme.

■ Prudhomme did present testimony regarding his contract with Trade, Inc., but did not prove the amount of damage incurred. A court can award damages within a range shown by the evidence. *Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir.1990). Under Texas law, a plaintiff who presents objective and uncontroverted evidence on an element of damage must be awarded some amount for that element. *Jackson v. Taylor*, 912 F.2d 795, 797 (5th Cir.1990) (applying Texas law in medical malpractice action). Nevertheless, the trier of fact may not "pull figures out of a hat" and damages may not be based upon a lack of credible evidence. *See Neiman–Marcus*, 919 F.2d at 372.

In the present case Prudhomme did not present objective and uncontroverted evidence of damage because the testimony was excluded by the court. In response to a proper interrogatory, *see* PX 32, Ans. to Int. No. 10, and deposition question, *see* Prudhomme Dep. Vol. II at 246, Prudhomme stated his items of damage had not been calculated but that he would supplement his answer when they had. He also said "[t]he damages of the lost profits of such sales and the damage of such lost sales have not yet been ascertained." PX 32, Ans. to Int. No. 10. He testified at deposition he did not know the amount of his loss. Because Prudhomme never supplemented his interrogatory and deposition answers as he agreed to do or as required by the rules, the court declined to permit Prudhomme to testify to the amount of loss. There is no evidence in the trial record to prove this element of his counterclaim and it must be dismissed with prejudice.

## B

The court turns next to Prudhomme's claim for tortious interference with prospective contracts. BKI contends Prudhomme did not plead a counterclaim for tortious interference with prospective contracts and should not now be permitted to expand his theories of recovery to the prejudice of BKI. *Cf.* PTO § III(D)(D1)(7) (labeling claim as one for tortious interference with contract). The court agrees and holds this claim is not properly before the court. Even if it were, Prudhomme has failed to prove BKI acted with malice.

■ It is settled in Texas that the tort of interference with business relations requires a showing that the interference was motivated by malice. *Champion v. Wright*, 740 S.W.2d 848, 854 (Tex.App. 1987, writ denied). The concept of malice has been interpreted to include the intent knowingly and purposefully to interfere for an improper purpose. *See id.* at 855 (dictum). Prudhomme has not proven that BKI sent the letters in question with a malicious animus or with the knowing and purposeful intent to interfere with Prudhomme's rebuilding business. The evidence is ample that BKI acted to address a perceived crisis in its exposure to product liability actions and to maintain the value of the KLUGE trademark and the company reputation.

\* \* \* \* \* \*

For the reasons stated, the court denies both parties all relief sought. The court has filed a judgment today.