**NELES–JAMESBURY, INC., Plaintiffs,**

v.

**VALVE DYNAMICS, INC. and Bill's Valves, Inc., Defendants.**

**Civil Action No. H–96–1419.**

United States District Court,
S.D. Texas,
Houston Division.

May 1, 1997.

William C. Norvell, Jr., Beirne Maynard and Parsons, Houston, TX, for Neles–Jamesbury, Inc.

William G. Lowerre, Schweinle Parish, Lowerre & Strawn, PC, Houston, TX, Anastassios Triantaphyllis, Houston, TX, for Valve Dynamics Inc and Bill's Valves Inc.

### MEMORANDUM AND ORDER *

ATLAS, District Judge.

Plaintiff Neles–Jamesbury, Inc. ("Plaintiff" or "Neles–Jamesbury"), a valve manufacturer, has brought this action against Defendants Valve Dynamics, Inc. ("Valve Dynamics"), a valve reseller, and Bill's Valves, Inc. ("Bill's Valves"), a valve reconditioner, alleging trademark infringement and unfair competition for Defendants' resale of reconditioned valves originally manufactured by Neles–Jamesbury. Pending before the Court are Neles–Jamesbury's Motion for [Partial] Summary Judgment Against Valve Dynamics [Doc. # 35], Motion for [Partial] Summary Judgment Against Bill's Valves [Doc. # 36], Motions to Strike Affidavits [Docs. # 103 and 104], and Motion for Leave to File a Motion to Strike Affirmative Defenses [Doc. # 111]. In addition, Defendant Valve Dynamics has filed a Motion for a Second Alternative Dispute Resolution Proceeding [Doc. # 92].

---

* This Memorandum and Order supersedes the Court's Memorandum and Order issued on January 22, 1997 [Doc. # 116]. The Court is reissuing its opinion in order to make several minor corrections to the original version on matters not disputed at trial.

The Court has considered the Motions, the Responses and Replies, all other matters of record in this case, and the relevant authorities. For the reasons stated below, both of Plaintiff's **Motions for [Partial] Summary Judgment** [Docs. # 35 and 36] are now **DENIED**, Plaintiff's **Motions to Strike Affidavits** [Docs. # 103 and 104] are **DENIED**, and Plaintiff's **Motion for Leave to File a Motion to Strike Affirmative Defenses** [Doc. # 111] is **GRANTED**. Defendant Valve Dynamics' **Motion for a Second Alternative Dispute Resolution Proceeding** [Doc. # 92] is **GRANTED**.

## I. *FACTUAL BACKGROUND*

For more than 35 years, Neles–Jamesbury has manufactured and sold industrial valves that are used to store and regulate the release of gases in such applications as petrochemical plants and fueling operations. Neles–Jamesbury has acquired a reputation for producing high quality valves and has achieved widespread product name recognition in its industry.[1] Its trademarks, which have been registered with the United States Patent and Trademark Office since 1968,[2] are cast on its valve bodies.

Defendant Bill's Valves reconditions and resells secondhand Neles–Jamesbury valves that either have been previously used or have been bought and left unused.[3] The reconditioning process includes activities such as sandblasting, cleaning, refitting the valve seats, "machining" the valve faces, putting together components, and testing the valves. *See* Deposition of Vasilios Kallergis (President of Bill's Valves), Exhibit D to Plaintiff's

Motion for Summary Judgment Against Bill's Valves ("Motion Against Bill's Valves") [Doc. # 36], at 22. When it resells the valves, Bill's Valves retains the Neles–Jamesbury trademark on the valve bodies. It does not, however, consistently mark the valves to indicate that they have been reconditioned. Neles–Jamesbury alleges that there is no evidence that Bill's Valves *ever* marks the valves it resells to identify itself as a reconditioner. Bill's Valves, on the other hand, claims that it "usually" stamps the bodies of its valves with a marking that reads "RECON BVI" (abbreviation for "Reconditioned, Bill's Valves, Inc.") after the valves are sold but before they leave Bill's Valves' facility. Bill's Valves has admitted, however, in its owner's deposition, that its employees often fail to stamp the valves before they are resold.[4]

Neles–Jamesbury alleges that Bill's Valves' practice of reconditioning and reselling these valves without effectively indicating to future purchasers that they are not firsthand Neles–Jamesbury valves produces a likelihood of confusion among buyers, who may attribute the secondhand valves' inferior quality to perceived defects in Neles–Jamesbury's manufacturing process. Neles–Jamesbury claims that such confusion harms its reputation as a high quality valve manufacturer and may even expose it to potential liability from purchasers of inferior quality reconditioned valves. It further alleges that such confusion may pose a physical danger to the public if secondhand valves, which no longer have the proper safety features, are mistakenly treated as firsthand valves.[5]

1. According to a 1995 study, Neles–Jamesbury valves were ranked first in name awareness and customer preference in the chemical industry. *See* Exhibit 11 to Plaintiff's First Amended Verified Complaint ("First Amended Complaint") [Doc. # 19] ("Ball Valves: A Study of Brand Awareness/Preference in the Chemical Industry," Chemical Processing, November 1995).

2. Plaintiff's predecessor corporation, Jamesbury, registered its trademark in 1968, and Neles–Jamesbury registered its trademark in 1992. *See* Exhibit 5 to First Amended Complaint (Certificates of Renewal and Registration).

3. According to Defendant Valve Dynamics, a construction company will often order more valves than it needs so that a construction project will not be delayed due to a shortage of valves.

When the project is finished, the company will sell, or apparently abandon, these surplus valves. Valve reconditioners acquire these valves, which have not been used but which have often been left lying around at construction projects, and sell them as "surplus new" valves.

4. *See* Deposition of Vasilios Kallergis, Exhibit D to Motion Against Bill's Valves, at 131 (Q: "Do you [stamp the valves]? A: Sometimes. Not all the time[.] . . . . Q: Why don't you stamp all the valves 'reconditioned'? A: Because we forgot— we forgot sometimes").

5. Neles–Jamesbury contends in particular that a series of its valves are "fire-safe," which means that they can be used in potentially hazardous applications involving, for example, poisonous or

The other defendant in this action, Valve Dynamics, is a valve reseller. Unlike Bill's Valves, Valve Dynamics does not itself recondition valves. Instead, it acts merely as an intermediary seller of new and used valves.[6] Valve Dynamics claims that when it purchases valves from a reseller such as Bill's Valves, it does not always know whether or not the valves have been reconditioned. Valve Dynamics does not alter any marking on the valve bodies.

This lawsuit arose after Neles–Jamesbury became aware of Defendants' practices, when ten reconditioned Neles–Jamesbury valves that were installed in a fuel operating system for the Greater Cleveland Rapid Transit Authority ("GCRTA") did not function properly. The end-user, GCRTA, who was apparently unaware that the valves were not factory new,[7] had received the valves through its general contractor as part of an installation within a natural gas fueling project. After GCRTA contacted Neles–Jamesbury to inquire about its problems with the valves, Plaintiff investigated and discovered that the valves had arrived at the GCRTA after passing through the hands of several intermediary distributors. The valves had been reconditioned by Bill's Valves but had not been marked as reconditioned. Bill's Valves then sold the valves to Valve Dynamics, who then delivered them to Wilson Technologies, Inc., a California corporation that was the contractor for the GCRTA project.[8]

Concerned upon learning that reconditioned Neles–Jamesbury valves were being sold to end-users without markings indicating that they were no longer firsthand, Neles–Jamesbury conducted a test purchase by ordering two of its valves, one new and one reconditioned, from Valve Dynamics. Valve Dynamics sold the requested valves to Neles–Jamesbury. The new valve was, as requested, a factory new Neles–Jamesbury valve. The reconditioned valve, which had been reconditioned by Davis Valve, Inc.,[9] was apparently not conspicuously and legibly marked as reconditioned.

Neles–Jamesbury brought this action against Bill's Valves and Valve Dynamics, alleging that Defendants, who are not authorized Neles–Jamesbury distributors, sold used valves still bearing the Neles–Jamesbury trademark as "new" and unlawfully failed to mark the valves as reconditioned.[10]

---

high pressure gases; if a valve reseller such as Bill's Valves does not indicate that an originally fire-safe valve has been reconditioned and is no longer fire-safe, an end-user may incorrectly assume that the valve is new and that it may be used in these dangerous applications. According to Neles–Jamesbury, such a mistake could lead to the release of poisonous gases or an explosion.

6. Valve Dynamics argues that it participates in a "secondary" resale valve market that employs different terminology from the "primary" market, which consists of transactions in which the seller is a valve manufacturer or its authorized distributor. Specifically, Valve Dynamics contends that in the secondary market, a "new" valve may refer either to a "factory new" valve sold directly by the manufacturer or its authorized distributor or to a "surplus new" valve which has been purchased previously and "may or may not have been repaired." See Opposition of Defendant Valve Dynamics, Inc. to Plaintiff's Motion for Partial Summary Judgment ("Valve Dynamics' Response") [Doc. # 100], at 5. Rather than adopt this controverted terminology, the Court will simply refer to valves sold directly by Neles–Jamesbury or its authorized distributor as "factory new" and valves that pass through Bill's Valves or another reconditioner as "reconditioned." Bill's Valves has acknowledged, during oral argument, that because it is a reconditioner, all valves that pass through its control are "re-

conditioned," even if Bill's Valves does not actually do anything to alter them.

7. See Declaration of Anthony Huszcza (GCRTA Station Engineer), Exhibit 14 to Motion Against Valve Dynamics ("At the time the valves were installed, they appeared to me to be new valves").

8. Wilson Technologies subcontracted the acquisition of the valves to Specialty Valve, a Canadian corporation. Specialty Valve ordered the ten valves from Valve Dynamics, which shipped them directly to Wilson Technologies in California.

9. Davis Valve, Inc., is not a party to this lawsuit. However, Plaintiff's predecessor, Jamesbury, has previously brought suit against Davis Valve, Inc., based on similar grounds to those alleged in this action. That suit resulted in a settlement between Jamesbury and Davis Valve. See Jamesbury Corp. v. Valve Liquidators, et al., No. H–86–2115 (S.D. Tex. filed May 20, 1986).

10. Accompanying its Answer to the Complaint, Bill's Valves filed a "Counterclaim" against Neles–Jamesbury, which was in substance a Motion to Dismiss [Doc. # 23]. Thereafter, Plaintiff filed a Motion to Dismiss Counterclaim of Bill's Valves for Failure to State a Claim [Doc. # 38]. On July 18, 1996 and on August 27, 1996, this

In its Second Amended Complaint ("Complaint") [Doc. # 56], Plaintiff states causes of action for trademark infringement, false representations and false designations of product origins, unfair competition, conversion, unjust enrichment, violations of federal and state anti-dilution statutes, and conspiracy. Neles–Jamesbury seeks a permanent injunction against Defendants' alleged unlawful activities as well as an accounting for all profits Defendants have derived from their alleged misuse of the Neles–Jamesbury trademark. In May 1996, Neles–Jamesbury obtained from this Court temporary restraining orders against Defendants and orders allowing Neles–Jamesbury to seize valves bearing its trademark and other items related to Plaintiff that were in Defendants' possession.[11] On May 20, 1996, the Court entered agreed preliminary injunctions against Defendants [Docs. # 28 and 29].

In its pending Motions for Summary Judgment, Neles–Jamesbury has requested a ruling from this Court that it is entitled to judgment against both Defendants on its claims for trademark infringement and for unfair competition.[12] Defendants strenuously oppose the Motions, arguing that a number of factual issues preclude judgment as a matter of law on these claims.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Bozé v. Branstetter*, 912 F.2d 801, 804 (5th Cir.1990).

The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *Bozé*, 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir.1995).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the nonmovant carries the burden of proof at trial, however, the movant may, by merely pointing to the absence of evidence supporting the essential elements of the nonmovant's case, shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact so as to warrant a trial. *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Douglass v. United Servs. Auto. Ass'n*, 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds*, 79 F.3d 1415 (5th Cir.1996) (en banc); *Little*, 37 F.3d at 1075. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands*, 66 F.3d at 92; *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990)). Rule 56

---

Court entered Orders [Docs. # 39 and 50] that purported to deny Bill's Valves' Motion to Dismiss. To clear up any possible confusion, the Court now declares that its Orders of July 18, 1996 and August 27, 1996, may be deemed to have granted Plaintiff's Motion to Dismiss Bill's Valves Counterclaim [Doc. # 38].

**11.** The Court granted the orders and allowed the seizures based on Plaintiff's argument that there

were urgent circumstances necessitating such relief. Specifically, Plaintiff alleged that Defendants' sale of unmarked valves that were not firesafe had created an imminent risk of personal injury.

**12.** Neles–Jamesbury does not dispute that its other causes of action require a trial. The Court has scheduled a trial to begin in this case on February 18, 1997.

mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552).

## III. *DISCUSSION*

■ Neles–Jamesbury bases its claim for trademark infringement on the federal Lanham Act, 15 U.S.C. § 1114(1),[13] and on Texas common law. *See* Counts I and II of Complaint, at 11–13. It bases its claim for unfair competition on Texas common law. *See* Count IV of Complaint, at 13. These two causes of action require the same standard and type of proof. *See Marathon Manufacturing Co. v. Enerlite Products Corp.,* 767 F.2d 214, 217 (5th Cir.1985) ("As a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition") (citing *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Manufacturing,* 510 F.2d 1004, 1009–10 (5th Cir.1975), *cert. de-*

**13.** Section 1114(1) provides in part that:
   Any person who shall, without the consent of the registrant—
   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.
   It is well established that this provision applies not only to cases in which an alleged infringer *creates* the reproduction, counterfeit, copy, or imitation of a registered mark, but also to cases in which a defendant modifies the plaintiff's product without removing the plaintiff's own rendition of its registered mark. *See, e.g., Brandtjen & Kluge, Inc. v. Prudhomme,* 765 F.Supp. 1551, 1563 (N.D.Tex.1991); *Joy Manufacturing Co.,* 730 F.Supp. 1387, 1394–95 (S.D.Tex.1989); *Adolph Coors Co. v. A. Genderson & Sons,* 486 F.Supp. 131, 135 (D.Col.1980).

**14.** Neles–Jamesbury insists that this Court may find likelihood of confusion as a matter of law, but it supports this claim with only authority from other Circuits, district courts in this Circuit, and a 1968 Fifth Circuit case, *Beef/Eater Restaurants, Inc. v. James Burrough Limited,* 398 F.2d 637 (5th Cir.1968), that has clearly been superseded in this respect by more recent Fifth Circuit opinions.

*nied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975)).

■ "The gravamen for any action of trademark infringement or common law unfair competition is whether the challenged mark is likely to cause confusion." *Marathon Manufacturing,* 767 F.2d at 217 (5th Cir.1985) (citations omitted); *see also Society of Financial Examiners v. National Ass'n of Certified Fraud Examiners, Inc.,* 41 F.3d 223, 225 (5th Cir.1995), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255. In the Fifth Circuit, the question of whether a defendant has created a likelihood of confusion in a trademark infringement case is clearly an issue of fact. *See id.,* at 226 (precluding judgment as a matter of law on a trademark infringement action unless a factual finding regarding likelihood of confusion would be "preordained"); *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 595 n. 4 (5th Cir.1985); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th Cir.1980), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).[14]

■ Under the well-established test in this Circuit, the factfinder must consider

In *Marathon Manufacturing,* for example, a 1985 case, the Fifth Circuit held that it was improper for the district court to determine likelihood of confusion in a trademark infringement case on a motion for summary judgment. 767 F.2d at 217. The Court of Appeals chose, however, to affirm the judgment, but only on the ground that both parties had filed cross-motions for summary judgment and thus both parties believed that they had submitted sufficient evidence for the court to make a factual finding. Deciding that the district court had, in effect, misnamed a trial procedure a "summary judgment hearing," the Fifth Circuit concluded that the district court committed a harmless procedural error. In the case at bar, in contrast, Defendants have not filed cross-motions for summary judgment but instead strenuously oppose the Court precluding them from the opportunity to refute all of Plaintiff's claims at trial.
In *Society of Financial Examiners,* the Fifth Circuit in 1995 reversed a district court for holding that the "fact-intensive" likelihood of confusion inquiry could be conducted without a trial. 41 F.3d at 224–25. The court reaffirmed *Marathon Manufacturing* strong presumption against district courts' deciding trademark infringement cases as a matter of law:
   Although both critical determinations [including likelihood of confusion] were factual, the district court believed summary judgment appropriate. Whereas general principles of summary judgment assail this conclusion, the ex-

eight factors in determining whether a party's alleged infringement of another's trademark is likely to cause confusion among product consumers. These factors include: (1) the strength of the plaintiff's trademark; (2) the similarity of design between the parties' trademarks; (3) the similarity of the parties' products; (4) the identity of retail outlets and purchasers; (5) the similarity of advertising media; (6) the defendants' intent; (7) actual confusion; (8) and the degree of care exercised by potential purchasers. *See Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 170 (5th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871; *Brandtjen*, 765 F.Supp. 1551, 1565 (N.D.Tex. 1991). In addition, the district court in *Brandtjen* added three factors to this list that apply particularly well to this situation in which a party sells a rebuilt or reconditioned product that retains the trademark of the original manufacturer. These additional factors include: (9) the extent and nature of changes made to the product; (10) the clarity and distinctiveness of the labeling on the reconditioned product; and (11) the degree to which any inferior qualities associated with the reconditioned product would likely

to be identified by the typical purchaser with the manufacturer. *Id.*, at 1567. The *Brandtjen* court derived these additional factors from two Supreme Court opinions, *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924), and *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947), which addressed remedies in trademark infringement cases involving reconditioned products.[15] The Court is persuaded by the reasoning of *Brandtjen* and, finding these additional factors applicable to Neles–Jamesbury's claims, adopts them for purposes of consideration of Plaintiff's Motions and preparation of the jury charge at trial.[16]

■ In determining whether Defendants created a likelihood of confusion, the factfinder must consider and weigh the importance of all of the factors listed here; there is no firm rule requiring that a specific number, or even a majority, of these factors be satisfied.[17] The Court believes that Neles–Jamesbury has submitted extremely strong evidence supporting Defendants' liability with respect to most of these factors. How-

---

plicit guidance of *Marathon Manufacturing* . . . decimates it.
*Society of Financial Examiners*, 41 F.3d at 225. The only Fifth Circuit case cited by Plaintiff decided since *Beef/Eater*, that approved a district court's granting of summary judgment in a trademark infringement case, involved a highly unusual procedural circumstance. *See, e.g.*, In *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir.1971), the Court of Appeals acknowledged that likelihood of confusion is a factual issue. However, it affirmed the trial court's decision to grant summary judgment *after* the court declared a mistrial due to juror misconduct. In that case, the court had already heard all the parties' evidence presented at trial.

15. Both of these Supreme Court cases were decided before the effective date of the Lanham Act, July 5, 1947. However, other courts have nevertheless looked to *Champion Spark Plug* for guidance in deciding trademark infringement cases brought after passage of the Act. *See, e.g., Texas Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc.*, 951 F.2d 684 (5th Cir.1992); *Singer Manufacturing Co. v. Briley*, 207 F.2d 519, 522 n. 3 (5th Cir.1953) (affirming as modified a district court trademark infringement opinion that relied on *Champion Spark Plug*).

16. The Court agrees with the *Brandtjen* court's recommendation that "a rebuilding case is sufficiently unique to trademark infringement and unfair competition jurisprudence that [these] ad-

ditional considerations should become standard in these cases." *Brandtjen*, 765 F.Supp. at 1567.

17. In justifying its incorporation of the three additional factors into the traditional Fifth Circuit eight-factor trademark infringement test, the *Brandtjen* court noted that:

There is . . . considerable latitude available to the factfinder in considering and weighing the traditional octinary factors. The elements are recognized in this circuit as being nonexclusive, *see, e.g. Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 149 (5th Cir.1985), no one factor is dispositive and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved, *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir.1985) (per curiam), and the plaintiff need not support a claim by a majority of the factors, *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1159 (5th Cir.1982). Because the weight to be given to the various factors is a matter for the factfinder, "as long as it appears that all relevant proffered evidence was considered and that no impermissible inferences were drawn from that evidence, the factfinder's determination will not be overturned unless clearly erroneous." *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 n. 9 (5th Cir.1984).
*Brandtjen*, 765 F.Supp. at 1565.

ever, as noted earlier, in this Circuit likelihood of confusion is a fact issue that, except in rare circumstances, should not be determined on a motion for summary judgment. In light of this rule and in light of the following analysis, the Court concludes, viewing the submitted evidence in the light most favorable to the non-moving parties, that Defendants have raised genuine issues of material fact as to a number of the applicable factors. Thus, Plaintiff must prove its claims of trademark infringement and unfair competition to a jury.

### 1. Strength of Plaintiff's Trademark

As noted by the *Brandtjen* court, the strength of a manufacturer's trademark is not particularly relevant to a case involving reconditioned products[18] because, no matter how strong or weak the trademark, there is no question that the defendant sellers are deriving whatever advantage may attach to use of the plaintiff's mark. In any case, this factor is not in issue here because Defendants in this action do not dispute that Neles–Jamesbury has developed widespread recognition of its trademark throughout the valve industry.[19]

### 2. Similarity of Design Between Parties' Trademarks

In a case of reconditioned products still bearing the manufacturer's original trademark, the allegedly infringing trademark is undisputedly identical to the original. Thus, similarity of design between the parties' trademarks, like the strength of Plaintiff's trademark, is not a disputed, or relevant, consideration in the case at bar. *See Brandtjen*, 765 F.Supp. at 1567.

### 3. Similarity of the Products

In this case, the parties' products are not only similar but are in fact identical, except in that Defendants' valves are reconditioned versions of Plaintiff's original valves. Thus, it appears that Plaintiff has a strong argument that, in the absence of prominent markings indicating that reconditioned valves have in fact been reconditioned, the valves are so similar[20] that buyers of the reconditioned valves are likely to be confused regarding whether the valves they purchase are factory new, and thus supplied directly through Neles–Jamesbury, or are reconditioned by a seller such as Bill's Valves.

However, by Plaintiff's own admission, there is a factual question regarding the extent of similarity between the Neles–Jamesbury factory new valves and Bill's Valves' reconditioned valves. Neles–Jamesbury's Senior Engineer testified that when he inspected one of the malfunctioning valves installed in the GCRTA project, he found a number of glaring modifications and defects in the valve.[21] If Neles–Jamesbury has as strong a reputation as it claims it has for producing high quality valves, then such evidence, that Defendants' reconditioned valves

18. *See* 765 F.Supp. at 1567 ("an evaluation of the strength of the plaintiff's mark ... would appear deserving of little attention in the typical rebuilt product case").

19. Plaintiff, however, has the right to present evidence regarding this factor at trial since Defendants' admitted recognition of the strength of the trademark may be probative of another factor, their intent to infringe. Specifically, evidence of the strength of the trademark may suggest the inference that Defendants intentionally created confusion among buyers in order to capitalize on Neles–Jamesbury's strong reputation as a high quality valve manufacturer.

20. In fact, Plaintiff has offered evidence that Bill's Valves' reconditioning process is specifically designed to make the valves appear as similar to original Neles–Jamesbury valves as possible. Bill's Valves has admitted that it intentionally painted the handles of its reconditioned valves the same color as the handles on factory new Neles–Jamesbury valves. *See* Deposition of Va-

silios Kallergis, Exhibit E to Motion Against Bill's Valves, at 268 ("Q: [W]hy would you spray paint blue on those handles? A: Because ... Jamesbury [handles have a] blue color").

21. These defects included a mislocated and upside down Neles–Jamesbury nameplate; "burred edges" on the valve insert; tool marks on the unpolished ball from the valve; and non-authentic valve seats that had smooth, rather than angled, inner contours. *See* Affidavit of Bruce Wetherbee, Exhibit 7 to Plaintiff's Motion for Summary Judgment Against Valve Dynamics ("Motion Against Valve Dynamics") [Doc. # 35], at 4–5. In addition, the Neles–Jamesbury representative who inspected the reconditioned valve that Plaintiff ordered directly from Valve Dynamics testified that this valve had prominent defects including a handle attached backwards, an insert cover not marked to indicate whether the valve was locked or unlocked, an overlapping "burr" on the edges between the insert and the valve body, and a smooth, unauthentic valve seat. See

are so clearly inferior to factory new valves, creates a fact issue as to whether the parties' valves are similar enough to confuse buyers, or whether they are instead so distinct that potential buyers would be likely to know that Defendants' valves did not come directly from the manufacturer. In addition, Defendants argue that the reconditioned valves are perceptibly different from factory new valves in that the reconditioned valves cost significantly less than factory new valves.[22] Whether this cost feature is apparent to end-users of a reconditioned valve is clearly a question of fact since valves may be sold as components in a piece of equipment, as they were for the GCRTA project.

### 4. *Identity of Retail Outlets and Purchasers*

Defendants' principal argument in response to Plaintiff's claims is that the valve industry contains two distinct markets, a primary market for factory new valves and a secondary market for reconditioned valves. Defendants contend, as the foundation for their defense, that their customers are not the general public, but instead are specialized engineering companies who are sophisticated consumers, knowledgeable about industrial valves and likely to know when they purchase valves which market they are entering.[23] Plaintiff, on the other hand, labels absurd Defendants' concept that there are two different markets and contends instead that the same purchasers may buy both factory new valves from Neles–Jamesbury and reconditioned valves from Defendants. Plaintiff further contends that, unless reconditioned valves are clearly marked as such, even a sophisticated buyer would be unlikely to know that a valve is not factory new.

This issue is a question requiring further factual development at trial. Other than the parties' own descriptions of the state of the valve market and Plaintiff's controverted evidence regarding one allegedly confused purchaser, the GCRTA, the record does not contain sufficient evidence regarding the identities and expectations of the parties' potential customers for the Court to determine the validity of Defendants' "two market" argument.[24]

### 5. *Similarity of Advertising Media*

The parties have presented virtually no evidence to the Court regarding how they

---

Declaration of John Bass, Exhibit 9 to Motion Against Valve Dynamics.

**22.** Valve Dynamics alleges that it quoted prices to Specialty Valves of $997 for a factory new Neles–Jamesbury valve and $565 for a reconditioned Neles–Jamesbury valve. *See* Valve Dynamics' Response, at 7.

**23.** The Court notes that Defendants' case cannot rest solely on the argument that their customers are "sophisticated consumers." In *Fuji Photo Film,* the Fifth Circuit reversed a district court for deciding, following a bench trial, that the defendant had refuted the plaintiff's trademark infringement claim when the court found the "most decisive factor" to be the sophistication of the defendant's buyers and the high cost of the product. 754 F.2d at 595. The Court of Appeals held that the district court erred by relying primarily on this factor and "equating the admitted technical sophistication of . . . purchasers with trademark sophistication." *Id.* The Fifth Circuit reasoned as follows:

> We may assume the purchasers of presses to be sophisticated about printing; we may also assume that presses, which cost tens of thousands of dollars, are not bought on impulse, but rather with a great deal of care. We may not assume that these facts are determinative. . . .
> It is true that in most instances technicians would use the products of either party and

they are a discriminating group of people but that does not eliminate the likelihood of purchaser confusion here. Being skilled in their own art does not necessarily preclude their mistaking one trademark for another. *Id,* at 595–96 (quoting *Wincharger Corp. v. Rinco, Inc.,* 297 F.2d 261, 264, 49 C.C.P.A. 849 (C.C.P.A.1962)). The Fifth Circuit concluded that " '[t]here is absolutely no evidence in this case to show that a busy printer will bother to investigate any of the supplies which he uses.' " *Id.,* at 596. Under *Fuji,* therefore, Defendants must accompany any evidence they may present at trial regarding their customers' alleged sophistication with specific proof that if Defendants' customers are not made clearly aware that they have purchased reconditioned valves, they are likely to investigate their valves' histories. *See also Singer Manufacturing Co.,* 207 F.2d 519, 522 n. 3 ("The test of infringement is not whether the conduct is such as to mislead the careful and discriminating purchaser, but it is enough if it may mislead the ordinary and casual buyer"). The mere fact that engineers are sophisticated customers does not in itself prove that the average engineer purchaser will be especially discriminating when selecting all of the component parts for a construction project.

**24.** Even conclusive proof of the existence of two markets may be of limited help to Defendants in this case. In *World Carpets,* the court, affirming

advertise their respective products to potential customers. Thus, this factor clearly raises a question of fact for trial.

### 6. Defendants' Intent

Intent to confuse buyers is an important factor that bears heavily on the analysis of whether Defendants have in fact created a likelihood of confusion with respect to their reconditioned valves.[25] Plaintiff has submitted persuasive evidence that Bill's Valves intended for customers to believe its reconditioned valves were actually factory new Neles–Jamesbury valves.[26] In contrast, Valve Dynamics has persuasively argued that it did not intend to create any confusion but that any confusion it may have caused was not of its own making since it is merely a reseller and does not ever recondition or alter valves. Thus, Valve Dynamics argues that its wrongdoing, if any, was inadvertent.

Because intent or lack of intent is only one factor in this multi-part analysis which the factfinder must consider in determining whether Defendants are liable for trademark infringement and unfair competition and because "summary judgment is rarely proper when an issue of intent is involved," *Guillory v. Domtar Industries, Inc.*, 95 F.3d 1320, 1326 (5th Cir.1996), the Court declines to make a factual finding regarding intent upon the present record.

### 7. Actual Confusion

Neles–Jamesbury strenuously argues that it is entitled to judgment as a matter of law on its trademark infringement and unfair competition claims because it has submitted proof of actual confusion by the GCRTA, an end-user purchaser of unmarked reconditioned Neles–Jamesbury valves. Neles–Jamesbury is correct that actual confusion is the best evidence of likelihood of confusion. *See Fuji Photo Film*, 754 F.2d at 597; *Amstar Corp.*, 615 F.2d at 263; *World Carpets*, 438 F.2d at 489 ("While very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof"). However, evidence of actual confusion is still only one factor among many that must be considered and weighed by the factfinder. Such evidence does not in itself conclusively satisfy, as a matter of law, the likelihood of confusion standard. Defendants may rebut the evidence of actual confusion with evidence, for example, that the confused customer was a rarity or drew an unreasonable conclusion and that there was no confusion regarding the reconditioned valves' history in the overwhelming majority of transactions.[27] Bill's Valves does in fact claim that, in its many years of business, it never received com-

---

a judgment of trademark infringement against a retailer who claimed it operated in a separate market from the plaintiff wholesaler, explained:

> [Defendant] asserts that since the parties aim at capturing different markets, retail vis-a-vis wholesale, confusion could not exist since there was no competition even within the carpet industry.
>
> Trademark jurisprudence, however, has long recognized that the lack of competitiveness is not always dispositive of the question of confusion and hence infringement. . . .
>
> If [Defendants] were permitted to continue to use the infringing mark, a choice on their part to market products of a lower grade or standard than the products marketed by [Plaintiff] could ultimately undermine the reputation of [Plaintiff] . . . Since the likelihood of a second user's practices adversely affecting the first user's reputation has been recognized as the basis for an actionable wrong, a fortiori an action will lie if the mere fact that a second user's presence as a retailer adversely affects the first user's competitive ability as a wholesaler.

*World Carpets*, 438 F.2d at 488. Thus, even if Defendants are correct that reconditioned valves are bought and sold in an entirely separate market from factory new valves, they could still be liable if Defendants' reconditioned valves are shown to affect adversely Neles–Jamesbury's reputation as a high quality valve manufacturer.

25. *See Amstar Corp.*, 615 F.2d at 263 ("intent . . . is a critical factor, since if the mark was adopted with the intent of deriving benefit from the [Plaintiff's] reputation . . . that fact alone 'may be sufficient to justify the inference that there is confusing similarity' ") (citing Restatement of Torts § 729, Comment f (1938)); *Fuji Photo Film*, 754 F.2d at 596 (reversing district court for allowing good faith to serve as a defense, but noting that "[b]ad faith, however, may, without more, prove infringement").

26. *See e.g., supra* note 20.

27. In *Amstar Corp.*, the Fifth Circuit reversed a district court's finding, following a bench trial, of likelihood of confusion in a trademark infringement case, despite the fact that the plaintiff sub-

plaints from dissatisfied buyers, who believed they had purchased factory new valves.[28]

Because the parties have not submitted to the Court any specific evidence regarding the full scope of their sales, the Court cannot determine whether Plaintiff's purported evidence of actual confusion, regarding the ten valves sold to the GCRTA, was especially significant.[29] Thus, the extent of actual confusion is a genuine question for trial.

### 8. The Degree of Care Exercised by Potential Purchasers

As to the factor regarding the degree of care exercised by potential purchasers, Defendants argue, again, that there are two distinct valve markets and that valve buyers, who are sophisticated consumers, know which market they are entering when they make their purchases. However, as demonstrated by the winding chain of distribution of the valves installed in the GCRTA project, it appears that valves may often pass through several intermediaries before reaching their end-user. This occurrence also demonstrates that a valve may be installed as an unidentified or relatively minor component of a complex piece of equipment and thus receive little or no scrutiny by the end-user.

Because the valves may pass through several layers of sales intermediaries, Defendants will have a difficult time proving that, without markings clearly imprinted on the valves themselves, potential purchasers (other than Neles–Jamesbury) will be able to identify the source of the valves.[30] Moreover, it is not apparent from this record that sellers of reconditioned valves maintain, or retain for any substantial length of time, records necessary to pass along accurate information regarding the nature or source of their valves' reconditioning. Notwithstanding these evidentiary difficulties, Defendants' argument regarding the sophistication of their customers raises a fact question on the potential degree of care factor.

### 9. The Extent and Nature of Changes Made to the Product

The factor regarding "extent and nature of changes made to the product" overlaps with, but addresses more specifically in this case, the issue raised by the third factor discussed above, "similarity of the products." When the *Brandtjen* court added this ninth factor to the traditional list, it was considering a case in which "the reconditioning of or repair to a product [is] so extensive that is would be

---

mitted some evidence of actual confusion. The court reasoned that:

> In view of the fact that both plaintiff's and defendants' sales currently run into the millions of dollars each year, these isolated instances of actual confusion are insufficient to sustain a finding of likelihood of confusion ... Indeed, the fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future.

615 F.2d at 263.

**28.** However, it appears that Bill's Valves does not consistently mark its valves in such a way that future buyers could identify Bill's Valves as the source of the confusion. Thus, even if customers farther down the distribution chain experienced problems with the reconditioned valves, there is little likelihood that the end-user would inform Bill's Valves of that fact.

**29.** Defendants insistently argue that, because Plaintiff has produced evidence of actual confusion with respect to only ten valves, Plaintiff's entire claim for trademark infringement and unfair competition is limited to those ten valves. This argument is utterly without merit. As indi-

cated in the discussion above, *actual confusion* is merely evidence supporting Plaintiff's ultimate burden of showing that Defendants' actions created *likelihood of confusion* among potential valve purchasers. Thus, Plaintiff may obtain whatever remedy to which it is entitled for *all* of the valve transactions for which it can prove at trial that Defendants created a likelihood of confusion. Plaintiff is not limited to a remedy for only the transactions in which it can prove actual confusion. *See World Carpets*, 438 F.2d at 489 ("It is not necessary to show actual confusion. One merely has to show likelihood of confusion exists").

**30.** Even if buyers are not likely to be confused that the valves have been reconditioned, Defendants may still be liable if customers mistakenly believe that Neles–Jamesbury authorizes or endorses' Defendants' activities. *Fuji Photo Film*, 754 F.2d at 596 (" 'likelihood of confusion' may be found absent confusion as to source; trademark infringement occurs also 'when the use sought to be enjoined is likely to confuse purchasers with respect to ... [the products'] endorsement by the plaintiff, or its connection with the plaintiff' ") (quoting *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 384 (5th Cir.1977)).

a misnomer to call the article by its original name." *See Brandtjen,* 765 F.Supp. at 1570 (citing *Champion Spark Plug,* 331 U.S. at 129, 67 S.Ct. at 1138–39). In the case at bar, however, Plaintiff argues that whatever changes Bill's Valves makes to the valves only serve to make the parties' products *more,* rather than *less,* similar and thus increase the likelihood of confusion among buyers. Defendants respond that even if Bill's Valves does succeed in altering the valves so that they appear similar to factory new Neles–Jamesbury valves (a conclusion that Neles–Jamesbury's own evidence may refute, *see supra* Section 111.3. and note 21), their customers should and do know the difference.

The parties have presented the Court with only conclusory statements regarding the extent of the changes made by Bill's Valves' reconditioning process. Consideration of this factor, therefore, requires more elaborate evidentiary proof that can only be adequately developed at a trial.

## 10. *The Clarity and Distinctiveness of the Labeling on the Reconditioned Product*

In its Motions, Neles–Jamesbury places the greatest emphasis on its argument that Defendants did not adequately mark the reconditioned valves, as it claims Defendants are required to do under the Supreme Court's opinion in *Champion Spark Plug,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386, and its progeny. However, the issue of adequate marking is, again, merely one factor to be considered by the factfinder in determining whether Defendants' actions created a likelihood of confusion among buyers. In this Court's opinion, based on the valve samples presented in Court and the other summary judgment evidence, Defendants failed to satisfy the marking requirements approved or ordered by courts, as remedies following findings of liability, in all other reconditioned products cases cited by the parties.[31] However, the Court concludes

31. Bill's Valves admits that when it does mark its reconditioned valves, it does so by stamping only the phrase "RECON BVI" on the valve bodies in letters that are $\%_6$ of an inch tall. (In contrast, the Neles–Jamesbury trademark appears on the valve bodies in large lettering easily discernible from a distance.) Having had the opportunity to view a sample marked valve following oral argument, the Court believes that it is highly unlikely that anyone who is not specifically looking for it would notice Bill's Valves' marking.

In the cited cases, after findings of infringement were entered, defendants were ordered to make much clearer markings than Bill's Valves has even claimed to make. In *Champion Spark Plug,* the Supreme Court stated that reconditioning "is wholly permissible so long as the manufacturer is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the dealer," 331 U.S. at 130, 67 S.Ct. at 1139. Before the lawsuit, each reconditioned plug had, stamped on it "in small letters, blue on black, the word 'Renewed,' which at time [sic] is almost illegible." 331 U.S. at 126, 67 S.Ct. at 1137. After a finding of trademark infringement, the district court enjoined the defendants from selling any reconditioned spark plugs unless they removed the plaintiff's original trademark, repainted the plugs, stamped the word "repaired" in large distinct letters on the plugs, and included in the cartons in which the plugs were packed a legend specifying the plugs' level of fitness and the reconditioner's full name and street address. *See* 331 U.S. at 126–27, 67 S.Ct. at 1137–38. *The Supreme Court affirmed*

the Second Circuit's decision, which modified the district court's remedy by eliminating the requirement that the defendants remove the trademark of the original manufacturer, substituted a new procedure by which defendants would stamp "repaired" on the plugs, and replaced the prescribed accompanying legend with a more general legend that did not require a specific guarantee of how many miles the reconditioned spark plugs would remain fit for use. *See id,* at 127, 67 S.Ct. at 1137–38.

*In Singer Manufacturing Co.,* the Fifth Circuit held that while " 'the defendants may repair, renovate, and rebuild Singer Sewing Machines and sell them to the public, in so doing the repaired, renovated or rebuilt machines must be so plainly and truthfully labeled as to plainly and truthfully convey to the buying public the true character of the machines.' " 207 F.2d at 522. The Court of Appeals affirmed the district court's order that the defendants place on each rebuilt sewing machine a "plainly legible" "medallion or decalcomania" "showing: 1. That the machine is rebuilt. 2. By whom rebuilt. 3. That non-Singer parts have been used in rebuilding. 4. If the machine was originally a treadle machine, that fact shall be stated." 207 F.2d at 522 n. 3. In *Joy Manufacturing Co.,* 730 F.Supp. 1387, 1392 (S.D.Tex.1989), the court enjoined the defendant from selling reconditioned valves "unless they bore nameplates permanently affixed to the valve bodies prominently displaying substantially the following notice: THIS VALVE DISMANTLED, INSPECTED AND REMANUFACTURED BY CGM VALVE CO., INC." 730 F.Supp. at 1392.

that failure to mark adequately does not automatically render a party liable, as a matter of law, for trademark infringement or unfair competition.[32] To this Court's knowledge, neither the Supreme Court nor the Fifth Circuit has specifically established the bare minimum markings necessary under the law for reconditioned products.[33]

As the *Brandtjen* court concluded from its analysis of *Champion Spark Plug*, evidence that Defendants did not adequately mark the reconditioned product will *support* Plaintiff's claim for Defendants' liability insofar as such evidence may help convince the factfinder that Defendants' practice created a likelihood of confusion among buyers. Neles–Jamesbury's specific arguments regarding what marking Defendants *should* make on the valves will also be useful in determining a proper injunctive remedy, if liability is in fact found in this case.[34] However, as noted

above, these arguments and evidence do not in themselves conclusively establish Defendants' liability.

## 11. The Degree to Which Any Inferior Qualities Associated With the Reconditioned Product Would Likely to Be Identified by the Typical Purchaser With the Manufacturer

In the Court's view, this factor, which combines elements of a number of the other factors discussed above, addresses the crux of Neles–Jamesbury's claims against Defendants in this action. For reasons described throughout this opinion, this issue is clearly a question of fact that must be determined by the jury at trial.

### Conclusion

Plaintiff's Motions for Summary Judgment each are denied since there are numerous

---

**32.** *In Champion Spark Plug*, the Supreme Court merely affirmed a remedy for trademark infringement ordered by the lower courts. Liability was not an issue on appeal. *See* 331 U.S. at 128, 67 S.Ct. at 1138 ("There is no challenge here to the findings as to the misleading character of the merchandising methods employed by respondents, nor to the conclusion that they have not only infringed petitioner's trade mark but have also engaged in unfair competition. The controversy here relates to the adequacy of the relief granted"). The Supreme Court granted certiorari to resolve a split between the Second and Eighth Circuits regarding whether a product reconditioner must remove the manufacturer's original trademark. The Court held that, in view of the specific facts of the case, the reconditioner did not have to remove the trademark. *See id.*, at 130–31, 67 S.Ct. at 1139–40 ("We cannot say that the conduct of respondents in this case, or the nature of the article involved and the characteristics of the merchandising methods used to sell it, called for more stringent controls than the Circuit Court of Appeals provided"). In the case at bar, Neles–Jamesbury has not requested that Defendants be ordered to remove the Neles–Jamesbury trademark from the valve bodies. Instead, Neles–Jamesbury has requested only an injunctive order requiring that Bill's Valves *add* its own clear marking that it has reconditioned the valves. *See* Complaint, at 18–19.

Likewise, liability was not an issue in *Singer Manufacturing Co.*, because the defendants did not appeal the judgment of liability. *See* 207 F.2d at 520.

In *Joy Manufacturing Co.*, however, the court did base liability solely on the defendant's failure to mark its products. There, the district court found, following a bench trial, that the defendant had willfully and deliberately violated the prelim-

inary injunction the court had issued earlier and also that, as the result of previous lawsuits against it, the defendant was "fully aware" that its practices were unlawful. *See* 730 F.Supp. at 1392. In contrast, in the case at bar, this Court does not conclude that it has a legal basis for avoiding the well-established multi-factor test for likelihood of confusion described, *e.g.*, in *Oreck Corp.*, 803 F.2d at 170.

**33.** On the contrary, a review of the cases indicates that the courts have refrained from establishing a strict standard and have instead encouraged courts to adopt remedies carefully tailored to the peculiar circumstances of each case. For example, in *Champion Spark Plug*, the Supreme Court suggested that courts look to defendants' willfulness and intent when fashioning a remedy for trademark infringement in reconditioned products case ("the character of the conduct giving rise to the unfair competition is relevant to the remedy which should be afforded.") 331 U.S. at 130, 67 S.Ct. at 1139. In *Singer Manufacturing Co.*, the Fifth Circuit amended the district court's injunction to provide that it would remain open for modification in light of the parties' experience under the decree. 207 F.2d at 522. *See also Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir.1990) ("relief granted [in a trademark infringement case] should be no broader than necessary to cure the effects of the harm caused").

**34.** In mediation, the parties apparently reached an agreement in principle regarding proposed injunctive relief However, to date, the parties have been unable to finalize this agreement. If, at trial, the jury finds Defendants liable, it will then be the Court's duty to fashion appropriate injunctive relief.

genuine questions of material fact requiring a trial by jury.

## IV. OTHER PENDING MOTIONS

### A. Plaintiff's Motion for Leave to File a Motion to Strike Affirmative Defenses

The Court grants Plaintiff's Motion for Leave to File a Motion to Strike Affirmative Defenses [Doc. # 111]. Plaintiff's Motion to Strike is deemed filed the day this Order is entered on the Court's docket. Defendants shall respond to this Motion within ten (10) business days of entry of this Order.

However, many of Defendants' affirmative defenses have been implicated in their extensive arguments in response to Plaintiff's Motions for Summary Judgment and therefore have been addressed by the Court's foregoing analysis. In addition, because Valve Dynamics has already briefed and argued the merits of many issues raised by its affirmative defenses, the Court supplements the foregoing conclusions with the following.

Valve Dynamics, in summary, argues as its first, second, third, eighth, ninth, tenth, eleventh, twelfth, and fifteenth affirmative defenses that it cannot be liable for trademark infringement or unfair competition because it does not itself recondition valves, because it sells what its sophisticated customers request and want, because it has no knowledge of the ultimate use of the products it sells, because it never received any complaints about the valves sold in 1994 that ultimately reached the GCRTA, because it has had no knowledge of any valves it has sold being defective, because it has followed "custom and practice" in making sales as it has, because it often does not even know whether or not the valves it passes along have been reconditioned, and because it has never intended to deceive anyone or willfully violate the law. None of these arguments in and of themselves are legally viable defenses to liability. At best, some are factual issues that may bear on the likelihood of confusion analysis. Otherwise, they are not viable arguments and may not be asserted at trial.

■ Valve Dynamics has correctly noted that Neles–Jamesbury has primarily cited cases that involve parties who reconditioned or altered the plaintiffs' products, not defendants who served only as resellers in a chain of sales of those products. However, Valve Dynamics has provided no legal authority for its contention that resellers in the chain of distribution should be excluded from liability for trademark infringement and unfair competition. On the contrary, the plain language of the Lanham Act clearly implicates all parties who "use [an infringing mark] in commerce." 15 U.S.C. § 1114(1). Although the Court has found no Fifth Circuit cases directly on point to this issue, courts in other circuits have held that intermediary sellers, in Valve Dynamics' position, can be liable for trademark infringement and unfair competition. See El Greco Leather Products Co., Inc. v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir.1986), cert. denied, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987) (reseller's "sale of the shoes was sufficient 'use' for it to be liable for the results of such infringement and its claimed lack of knowledge of its suppliers' infringement, even if true, provides no defense"); Adolph Coors Co. v. A. Genderson & Sons, Inc., 486 F.Supp. 131 (D.Colo.1980) (unauthorized beer distributor that did not actively alter product nevertheless infringed brewer's trademark by failing to follow brewer's quality control standards).

■ Valve Dynamics argues (like Bill's Valves) that it has had no intent to create any confusion. This argument, however, addresses merely one of the factors that the factfinder must consider in determining liability. In short, it is no defense that Valve Dynamics acted in good faith or was itself confused about the history of the valves that it sold. See Fuji Photo Film, 754 F.2d at 596 ("Good faith is not a defense to trademark infringement.... [I]f potential purchasers are confused, no amount of good faith can make them less so").

■ Nor is it a defense that Valve Dynamics merely gives its customers what they want—inexpensive or price discounted valves. Even if Valve Dynamics' customers request and are provided with reconditioned valves, if the valves are not clearly labeled as reconditioned, subsequent buyers farther down the distribution chain may be confused about whether the valves are reconditioned or factory new. Despite vociferous argu-

ment, Valve Dynamics has not supplied any authority limiting the likelihood of confusion test to only a seller's immediate buyer. On the contrary, a court in this district has stated that "[t]he likelihood of confusion is not limited to confusion at the initial point of sale; it can be at any point in the chain of distribution or ownership, including post-sale confusion of third parties who later encounter the product." *Joy Manufacturing Co.,* 730 F.Supp. at 1394 (citing *Lois Sportswear, USA, Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986)). If, after trial, the jury concludes that, regardless of intent, Valve Dynamics has been responsible for creating, or propagating, a likelihood of confusion, it will make no difference whether Valve Dynamics actually knew which valves that it sold were reconditioned. Instead, such a jury finding would establish that Valve Dynamics is under a legal obligation to determine the history of the valves it sells so as to prevent it from perpetuating its own confusion.

Because some of the likelihood of confusion factors relate specifically to the reconditioning process, the discussion in Section III occasionally refers only to Bill's Valves. (See, for example, the ninth factor, "the extent and nature of changes made to the product.") However, as the preceding analysis indicates, all of the factors must be considered in determining *both* Bill's Valves and Valve Dynamics' liability for trademark infringement and unfair competition. Even if Bill's Valves initially created liability by reconditioning the valves, Valve Dynamics may nevertheless still be liable for distributing, even unknowingly, the infringing product, if Valve Dynamics' own conduct (even its mere sale of the product) is found also to create a likelihood of confusion among buyers.[35]

Thus, it appears to the Court, that Valve Dynamics' first, second, third, eighth, ninth, tenth, eleventh, twelfth, and fifteenth affirmative defenses are not legally viable defenses to Plaintiff's claims. Valve Dynamics will

be allowed to argue at trial only factual matters to the extent they relate to the likelihood of confusion factors discussed in Section III. To the extent Bill's Valves asserts comparable defenses, this Order applies to Bill's Valves as well. To the extent Defendants contest this ruling, Defendants must enumerate their specific arguments in their responses to Plaintiff's Motion to Strike, and each argument must be accompanied by applicable legal authorities.

## B. *Plaintiff's Motion to Strike Affidavits*

In Plaintiff's Reply [Doc. # 103] to Bill's Valves' Response [Doc. # 101], Plaintiff objects to and moves to strike the affidavit of Bill's Valves' expert, Bob Ramsey, Final Attachment to Bill's Valves' Response. Plaintiff bases its Motion on allegations that Mr. Ramsey is currently on probation for a forgery conviction and is not an expert regarding valve reconditioning and that Mr. Ramsey's testimony is speculative, conclusory, and unsupported by the summary judgment evidence. The Court denies the motion as to Mr. Ramsey as moot since the Court did not rely on his testimony in considering Plaintiff's Motions. For the reasons discussed *supra* in Section IV.A., the defenses as to which Mr. Ramsey testified have little or no legal merit.

In Plaintiff's Reply [Doc. # 104] to Valve Dynamics' Response [Doc. # 100], Plaintiff also requests the Court to strike the affidavits of George McLeod, Janet Falco McLeod, and Brenda Boren, the individual owners and officers of Valve Dynamics who have averred they have personal knowledge of its business. Plaintiff contends that various paragraphs of the affidavits are irrelevant, self-serving, conclusory, speculative, and incompetent summary judgment evidence. The Court denies this request as overbroad and largely without merit. To the extent specific statements in the questioned paragraphs appear to be

---

**35.** Valve Dynamics' fifth affirmative defense, that equity bars injunctive relief, is not a matter to be argued to the jury at trial and will be addressed after trial as part of the Court's decisions as to an appropriate remedy, if the jury finds liability as to Valve Dynamics. Moreover, the Court is unaware of any legal basis for Valve Dynamics'

fourth affirmative defense that Neles–Jamesbury, the trademark registrant, lacks standing to assert the claims in the complaint, as amended. This is not a breach of warranty, fraud, or product liability action. Again, these conclusions apply equally to Bill's Valves' comparable affirmative defenses.

based on personal knowledge of the affiant and are deemed relevant, the Court relies on the statements, as set forth in the foregoing analysis.

### C. *Motion for Second ADR Proceeding*

Defendants Valve Dynamics and related individuals have moved for a second mediation [Doc. # 92] on the ground that Neles–Jamesbury failed to bring a corporate representative to the mediation that was conducted on November 13, 1996, as a result of the Court's Order of October 31, 1996. Plaintiff was represented by Mark Petersen, a Massachusetts attorney who serves as outside counsel to Plaintiff. In contrast, Defendants each had corporate officers and insurance carriers physically present to participate in the negotiation.

The Court concludes that another mediation is necessary in this case. *All* parties must bring corporate officers with authority sufficient to waive or pay the entire sums sought by Plaintiff in this case, if such individuals believe, in their discretion, after engaging in the mediation process that such action is warranted. In other words, each corporate representative (or insurance representative) must have *full* authority to negotiate the claims in this case. The cost of the mediation shall be divided one-third to each of the corporate parties. The parties shall obtain the services of Mr. Ronald G. Bliss, the mediator who handled the first mediation.

## V. *CONCLUSION*

For the foregoing reasons, it is

**ORDERED** that Plaintiff's **Motion for Summary Judgment** against Valve Dynamics [Doc. # 35] is **DENIED**. It is further

**ORDERED** that Plaintiff's **Motion for Summary Judgment** against Bill's Valves [Doc. # 36] is **DENIED**. It is further

**ORDERED** that Plaintiff's **Motion for Leave to File a Motion to Strike Affirmative Defenses** [Doc. # 111] is **GRANTED**. It is further

**ORDERED** that Plaintiff's **Motions to Strike Affidavits** [Docs. # 103 and 104] are **DENIED**. It is further

**ORDERED** that Valve Dynamics' **Motion for a Second Alternative Dispute Resolution Proceeding** [Doc. # 92] is **GRANTED**.